[920 NE2d 919, 892 NYS2d 812]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NASIN ARAFET, Appellant.

Argued September 17, 2009; decided October 22, 2009

## POINTS OF COUNSEL

*Cynthia Feathers*, Saratoga Springs, and *E. Stewart Jones Law Firm*, Troy (*E. Stewart Jones, Jr.*, of counsel), for appellant. The challenged ruling impermissibly eroded the century-old *Molineux* evidentiary rule by (1) finding that the *nature* of the subject tractor-trailer theft, in and of itself, was enough to prove defendant's identity and there was no need to show that the *manner* of execution was unique to admit proof of prior uncharged crimes, and (2) allowing vast evidence of other crimes by third parties with a fragile link to the crime charged. (*People v Mateo*, 93 NY2d 327; *People v Robinson*, 68 NY2d 541; *People v Condon*, 26 NY2d 139; *People v Sanza*, 121 AD2d 89; *People v Neu*, 126 AD2d 223, 70 NY2d 652; *People v Molineux*, 168 NY 264; *People v Alvino*, 71 NY2d 233; *People v Ely*, 68 NY2d 520; *People v Wlasiuk*, 32 AD3d 674, 7 NY3d 871; *People v Gorghan*, 13 AD3d 908, 4 NY3d 798.)

*Robert M. Carney, District Attorney*, Schenectady (*Philp W. Mueller* of counsel), for respondent. I. The trial judge did not err or abuse her discretion by permitting limited evidence of defendant's prior theft of cargo trailers, where it was necessary in a circumstantial case to prove defendant's identity as the

perpetrator by showing that he possessed or had access to the specialized knowledge, skills, equipment, facilities and criminal contacts needed to complete and profit from this highly-specialized crime. (*People v Ventimiglia,* 52 NY2d 350; *People v Allweiss,* 48 NY2d 40; *People v Barnes,* 50 NY2d 375; *People v Moore,* 42 NY2d 421; *People v Fitzgerald,* 156 NY 253; *People v Molineux,* 168 NY 264; *People v Bligen,* 35 AD3d 171, 8 NY3d 803; *People v Hills,* 140 AD2d 71; *People v Parker,* 50 AD3d 330; *People v Robinson,* 93 NY2d 986.) II. Evidence that defendant made his first phone call, immediately after stealing the cargo trailer, to Jose Gotay's trucking facility, where Gotay received stolen cargo, was properly admitted to show defendant's access to and contact with a cargo "fence," and was accompanied by effective limiting instructions. (*People v Santana,* 48 AD3d 286, 10 NY3d 844; *People v Wright,* 35 AD3d 172, 8 NY3d 928; *People v Delacruz,* 24 AD3d 109, 6 NY3d 775; *People v Giles,* 11 NY3d 495; *People v Cintron,* 95 NY2d 329.)

### OPINION OF THE COURT

SMITH, J.

Defendant, convicted of stealing a trailer containing a million dollars worth of merchandise, claims that his rights under *People v Molineux* (168 NY 264 [1901]) were violated when evidence of four other criminal incidents was admitted at his trial. As to three of the incidents, we hold that there was no error. The evidence relating to the fourth incident should not have been admitted, but the error was harmless.

### I

The trailer that defendant was charged with stealing disappeared from a parking lot in Rotterdam, New York, near Exit 25A of the New York State Thruway, around 9:30 A.M. on July 26, 2003. The trailer, emptied of its contents and attached to a tractor, was found abandoned two days later on a highway in New Jersey, some 20 miles from where defendant lived. The evidence linking defendant to the crime, though entirely circumstantial, was compelling.

Records of calls made on defendant's cellular telephone showed that he traveled northward from his New Jersey home early on the morning of July 26, arriving before the time of the theft in the general area where the theft occurred. They also showed that, beginning around the time of the theft, defendant traveled southward, back toward New Jersey. The fastest route

from the parking lot of Exit 25A to the area of northern New Jersey where defendant lived and where the trailer was found leaves the Thruway at Exit 15, about 120 miles south of Exit 25A. Records of the New York Thruway Authority showed that a Class 5 vehicle—a tractor-trailer—entered through Exit 25A at 9:35 A.M. on the day of the theft, and left the Thruway at Exit 15 an hour and 38 minutes later. No other tractor-trailer that had entered at Exit 25A left the Thruway at Exit 15 between 10:15 A.M. and 1:30 P.M. on that day. A toll ticket issued to the one tractor-trailer that did travel that route in the hours immediately after the theft bore defendant's fingerprint.

In addition, the cell phone records identified the recipients of calls that defendant made while on his southward journey. Three of the calls were to a business at 530 Duncan Avenue in Jersey City operated by Jose Gotay, who rented several truck bays there. A fourth call was to Florida, to a cell phone belonging to Nelson Quintanilla. Quintanilla's phone bills showed that, on July 27, the day after the theft, he began a journey northward from Florida, arriving in New Jersey on July 28, shortly before the abandoned tractor-trailer was found.

Of the four uncharged crimes at issue in this case, three involved the recipients of defendant's phone calls. Two were offered by the People to prove that Gotay's truck bays at 530 Duncan Avenue were used as part of a fencing operation. Thus, the People proved that cargo stolen from trailers had been received at Gotay's facility in December 2000, and again in December 2003 (some five months after the crime with which defendant was charged); there was no evidence connecting defendant to either of these two incidents. The People also proved that, in 1996, Quintanilla had been defendant's accomplice in the theft of another trailer. The fourth uncharged crime did not involve either Gotay or Quintanilla: The People proved that defendant had stolen a trailer in April 2000, working with accomplices not connected by any evidence to this case.

Evidence of all four incidents was admitted over defendant's objection under *Molineux*. A jury convicted defendant of grand larceny and criminal possession of stolen property, and the Appellate Division affirmed, with two Justices dissenting (54 AD3d 517 [2008]). An Appellate Division Justice granted leave to appeal, and we now affirm.

## II

The rule of *Molineux* is familiar: Evidence of uncharged crimes is inadmissible where its only purpose is to show bad

character or propensity towards crime (*People v Alvino*, 71 NY2d 233, 241 [1987]). The rule, we have explained, "is based on policy and not on logic" (*People v Allweiss*, 48 NY2d 40, 46 [1979]). It may be logical to conclude from a defendant's prior crimes that he is inclined to act criminally, but such evidence "is excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past" (*Alvino*, 71 NY2d at 241). However, "[w]hen evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused" (*Allweiss*, 48 NY2d at 47). A commonly used, though nonexhaustive, list names five so-called *Molineux* exceptions—i.e., purposes for which uncharged crimes might be relevant: "to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant" (*Alvino*, 71 NY2d at 242; *see also e.g.* *People v Ventimiglia*, 52 NY2d 350, 359 [1981]; *Molineux*, 168 NY at 293). Still, even if technically relevant for one of these or some other legitimate purpose, *Molineux* evidence will not be admitted if it "is actually of slight value when compared to the possible prejudice to the accused" (*Allweiss*, 48 NY2d at 47).

Applying these principles to this case, we conclude that the evidence relating to Gotay's fencing operation and to the crime committed in 1996 by defendant and Quintanilla was admissible. Evidence of the crime committed by defendant in April 2000 was not.

■ As to the evidence of Gotay's fencing operation, the issue is easy: This was not *Molineux* evidence at all. The point of *Molineux* is to prevent a jury from convicting a defendant because of his criminal propensity. Evidence of two criminal transactions in which defendant was not involved could show nothing about his propensity. The evidence was relevant to the case: It showed that a business defendant called in the hours immediately after the theft was one where stolen goods could be disposed of, and it thus supported an inference that defendant at that moment needed a fence's services.

■ The evidence of the 1996 crime, however, does present a *Molineux* issue, for that crime involved defendant as well as Quintanilla, and could have led a jury to infer that defendant had a propensity for crime. Still, it was not an abuse of discretion to admit the evidence (*see People v Dorm*, 12 NY3d 16, 19 [2009]). The predicate for its admission was evidence showing

that defendant called Quintanilla shortly after the theft; that Quintanilla traveled from Florida to New Jersey beginning the next day; and that Quintanilla arrived in northern New Jersey not long before the discovery of the stolen trailer, with a tractor attached, on a highway in the vicinity. Abandonment of the tractor-trailer (unless the thief walked away from it) was a task that required an accomplice with a second vehicle. The evidence supported an inference that Quintanilla provided defendant with the ride he needed.

We have held that evidence of "a distinctive repetitive pattern" of criminal conduct may be admitted under *Molineux* to show the defendant's identity (*Allweiss*, 48 NY2d at 48). Repeated commission of similar crimes with the same accomplice is an example of such a pattern (*People v Whitley*, 14 AD3d 403, 405 [1st Dept 2005]; *People v Palmer*, 263 AD2d 361 [1st Dept 1999]). Because the evidence supported a finding that Quintanilla and defendant were working together to commit the crime in this case, *Molineux* did not require that the jury be kept ignorant of the fact that they had worked together on such a transaction before.

■ There was, however, no valid ground for admitting proof of the April 2000 incident. The People acknowledge, in substance, that the only relevance of that proof was to show that defendant was an experienced trailer thief. This is not, the People argue, pure propensity evidence because of the nature of the crime—a specialized one, that required unusual skills, knowledge and access to the means of committing it. But we see no justification, at least in a case like this, for creating a "specialized crime" exception to *Molineux*. No doubt this crime is beyond the skills of the average citizen; most people could not swiftly hook a trailer to a tractor and drive it away. But the crime could probably have been committed by any experienced tractor-trailer driver, and we cannot believe there was no less prejudicial way to prove that defendant had experience in that line of work. This was not a crime "so unique that the mere proof that the defendant had committed a similar act would be highly probative of the fact that he committed the one charged" (*People v Condon*, 26 NY2d 139, 144 [1970]). Admitting the evidence of the April 2000 incident violated the *Molineux* rule.

### III

■ The outcome of this case thus turns on whether allowing the jury to learn of defendant's April 2000 crime was harmless error. We conclude that it was.

An error of law may be found harmless where "the proof of the defendant's guilt, without reference to the error, is overwhelming" and where there is no "significant probability . . . that the jury would have acquitted the defendant had it not been for the error" (*People v Crimmins*, 36 NY2d 230, 241-242 [1975]). Here, though there was no eyewitness to the crime and defendant did not admit it, the proof can fairly be called overwhelming. The key piece of evidence, of course, is defendant's fingerprint on the toll ticket.

Though the dissent suggests otherwise (dissenting op at 473), we find the proof that the fingerprint was indeed defendant's to be extremely clear. A qualified expert testified without contradiction that he had found "at least fifteen obvious points of identification in common" between the fingerprint on the toll card and one known to come from defendant's left index finger. It is of no significance that defendant shares one characteristic—a "loop" rather than a "whorl" or "arch" demarcation—with most of the population; the 15 points of identification prove the fingerprints match. Much of defense counsel's cross-examination of the expert was devoted to demonstrating that fingerprint analysis is not absolutely infallible; i.e., that mistakes in fingerprint identification are not unknown to history. Nothing in the record gives any ground for serious doubt about the accuracy of this particular identification.

The fingerprint, combined with the time of the toll ticket's issuance, shows that, within minutes of the time the stolen trailer disappeared, defendant drove a tractor-trailer onto the New York State Thruway at the exit where the theft occurred.* Thruway Authority records showed that the tractor-trailer defendant was driving left the Thruway at Exit 15, the exit that led toward the northern New Jersey area where defendant lived and the trailer was later found. No other tractor-trailer traveled the same route at approximately the same time. Before and shortly after leaving the Thruway, defendant placed phone calls to a fencing operation in northern New Jersey and to a former accomplice in a trailer theft. Beginning the next day, the former accomplice traveled from Florida to northern New Jersey, arriving there shortly before the trailer and the tractor hooked to it were found abandoned on a highway.

---

* There was also testimony from a tollbooth operator that he remembered seeing, and noticing some unusual features of, a tractor-trailer that entered at Exit 25A that morning. Since this testimony was not precise as to time, did not conclusively identify the tractor-trailer, and did not identify defendant, it adds little to our analysis of the facts.

All these facts were proved by near-irrefutable evidence and, taken together, they exclude to a virtual certainty any hypothesis of defendant's innocence. The idea that he happened to be pulling a trailer other than the stolen one, at the same time and over the same route that the stolen trailer would logically have traveled, while the stolen trailer was for some reason elsewhere, borders on the fanciful. The idea that, at the time of this astonishing coincidence, defendant just happened to place phone calls to Gotay's fencing operation (three times) and to his old accomplice Quintanilla is absurd.

Nor do we see any likelihood that the jury would have acquitted defendant if it had not heard the improperly admitted evidence. The jury properly had before it all the evidence we have just recited. Thus it would have known, without evidence of defendant's April 2000 crime, not only all the facts pointing to his commission of the 2003 theft, but also that he stole a trailer (with Quintanilla) in 1996. As to both the 1996 and the April 2000 incidents, the jury was instructed that they were "no proof whatsoever that he possessed a propensity or disposition to commit the crimes charged in this indictment or any other crime. It is not offered for such a purpose and must not be considered by you for that purpose." Of course, there can be no absolute certainty that the jury followed this instruction—but if it did not, the prejudicial effect of the evidence that was admitted in error could not have added much to the effect of the evidence properly admitted. There is no significant probability that the result in this case would have been different if the trial court had, as it should, excluded the evidence of defendant's April 2000 theft.

Accordingly, the order of the Appellate Division should be affirmed.

CIPARICK, J. (dissenting). Because the majority resorts to an improper application of the harmless error doctrine where County Court committed a flagrant *Molineux* violation in allowing highly prejudicial evidence as to defendant's prior federal felony conviction and a multitude of other collateral evidence concerning prior criminality, I respectfully dissent.* The glaring error of permitting an FBI special agent to testify at length as

---

* It is true, as the majority holds, that there is no unique or specialized crime exception under *People v Molineux* (168 NY 264 [1901]) providing for the admission of evidence of a prior complex crime to prove the identity of a defendant for the crime charged. If that were so, a jury would naturally infer

to defendant's prior cargo theft in April 2000—a crime of the very same nature as the charges in this case—most certainly impacted the jury to defendant's detriment. In addition, as this prosecution rested entirely on circumstantial evidence of less than compelling force, invocation of harmless error is not appropriate to avoid the conclusion that defendant was deprived of a fair trial.

Furthermore, County Court's admission of several hundred pages of testimony on numerous other collateral matters is most troubling. In addition to the *Molineux* error in allowing evidence of defendant's prior conviction for cargo theft, the court allowed evidence as to the underlying facts of defendant's alleged involvement in an uncharged cargo theft with an accomplice, one Nelson Quintanilla, in 1996, in yet another tractor-trailer heist. These errors were then further compounded by the admission of testimony from police officers as to the felony conviction of one Jose Gotay—a person not charged in this case—for receiving stolen cargo in December 2000 and his involvement in another such offense in December 2003. All of these collateral matters involved similar types of offenses as those with which defendant here was charged.

According to the majority, there was a nexus bonding the events in this case with Gotay's criminal past based upon phone records showing that calls from one of defendant's cell phones were made at about the time of the crime to a company where Gotay was listed as a contact person, which "supported an inference that defendant at that moment needed a fence's services" (*see* majority op at 465) sufficient to inject evidence of this third party's crimes into defendant's trial. As to the evidence involving Quintanilla, the majority states that "the evidence supported a finding that Quintanilla and the defendant were working together to commit the crime in this case" (*see* majority op at 466) when he allegedly abandoned the trailer in northern New Jersey. The majority concludes that the admission of these bad acts by other persons, where it is alleged that defendant was merely in contact with them at or about the time of the commission of the crime, was not unduly prejudicial to defendant. I disagree.

The prejudicial effect that all of this extensive collateral evidence had is clear: the jury was naturally led to believe that, because defendant had committed two cargo thefts in the past

that the defendant was guilty of the instant crime based solely upon propensity, and the ensuing prejudice would be almost insurmountable.

and at the time of this alleged crime telephoned a federally convicted "fence" of stolen goods, he was guilty of the crimes charged here. It is remarkable that one fifth of this trial record—spanning several hundred pages of trial testimony from numerous state and federal law enforcement officers and dozens of exhibits—is consumed by collateral matters, including multiple photographs depicting warehouses, stolen trucks and stolen goods related to extraneous crimes. In total, two FBI agents and three police officers testified as to uncharged matters and convictions involving cargo thefts and stolen goods. Much of the prosecution's summation was then centered upon these matters.

Our long history of more than a century of *Molineux* jurisprudence guards against the admissibility of a defendant's prior crimes, except in very limited circumstances, because of the real danger that such evidence would sway the jury to convict the defendant based upon prior bad acts and thus deprive the accused of the fundamental right to a fair trial (*see People v Molineux*, 168 NY 264, 313 [1901]). To introduce *Molineux* evidence, the prosecution must meet its burden of establishing that the probative value of the proffered material outweighs its prejudicial effect (*see People v Alvino*, 71 NY2d 233, 241-242 [1987]).

> "Prejudice involves both the nature of the crime, for the more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the inference which the uncharged crime [or prior charged crimes] evidence brings into play" (*People v Robinson*, 68 NY2d 541, 549 [1986]).

The reason for this is obvious: " 'it is much easier to believe in the guilt of an accused person when it is known or suspected that he [or she] has previously committed a similar crime' " (*People v Allweiss*, 48 NY2d 40, 48 [1979], quoting *People v Molineux*, 168 NY at 313). Hence, the admission of such collateral evidence must be subjected to "the most rigid scrutiny" (*Molineux*, 168 NY at 313).

I agree with the majority's holding that County Court erred in allowing evidence of defendant's prior federal conviction, but this error cannot be characterized as harmless. As the majority notes, the requirements for the *Molineux* identity exception were not established as to this past crime. Defendant's prior conviction for a cargo theft was not so unique or peculiar that it

involved a signature offense. As a prosecution witness explained at the trial, the theft of a tractor-trailer is a relatively common type of crime in this general region. Further, no witness at this trial could testify as to how defendant may have stolen this vehicle, much less that he did so in a peculiar and distinctive manner, thereby identifying himself as the culprit. Nor was the collateral evidence probative of a common scheme or plan because that crime and the charges here do not strike " 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations' " (*People v Fiore*, 34 NY2d 81, 85 [1974], quoting 2 Wigmore, Evidence § 304, at 202 [3d ed]). Moreover, even had the identity or common scheme or plan exceptions been established—which they were not—the probative value of this collateral evidence would have been outweighed by its potential for prejudice.

As to the evidence of defendant's uncharged cargo theft with Quintanilla, the majority concludes that this is classic *Molineux* identity evidence. They point out that previously defendant was accused of acting with several individuals in a cargo theft, one of whom he allegedly telephoned at the time of this crime. This mere alleged similarity, however, is not enough to meet the strictures of our *Molineux* jurisprudence.

To establish the identity exception, *Molineux* demands that there be evidence of a distinctive crime forming a uniqueness that necessarily identifies the defendant as its culprit, as would a signature. "A similar *modus operandi* is not enough; there must be sufficient uniqueness to identify the accused as the perpetrator of the crime charged" (Prince, Richardson on Evidence § 4-514 [Farrell 11th ed], citing *People v Robinson*, 68 NY2d at 548-549; *People v Beam*, 57 NY2d 241, 251-252 [1982]; *People v Allweiss*, 48 NY2d at 47-48). As *Molineux* long ago stated, " 'the naked similarity of . . . crimes proves nothing' " (*Robinson*, 68 NY2d at 549, quoting *Molineux*, 168 NY at 316).

Here, this uncharged cargo theft displays neither any sort of distinctive manner that conclusively identifies defendant in the allegations in this case, nor a pattern of criminal behavior. Rather, this evidence accomplishes nothing more than telling the jury of defendant's propensity to commit this type of offense based upon his alleged earlier engagement in a similar type of crime along with a person he may have telephoned at the time of this crime. Unknown are the contents of the telephone calls made from defendant's cell phone to Quintanilla or evidence

sufficient to substantiate the pure supposition that he was involved in the planning and execution of this crime. Thus, the purported linkage to Quintanilla, upon which extensive collateral evidence was based, is speculative and tenuous. Meanwhile, the potential for prejudice injected into the trial by such extensive collateral evidence is clear. As the prosecution argued to the jury in summation:

> "Maybe they are friends. It's good to be friends with your colleagues. That doesn't mean that at times they're not involved in some wrongdoing, and this—on this particular date, the calls surrounding this July 26, 2003, incident, I submit to you the evidence is they're up to no good, they're scheming about stealing this trailer, and that's what happened . . .

> "This is some planning to steal the trailer here and then sell the contents and make some money from it."

It is settled law that when evidence is of slight value when compared to the possible prejudice to the accused that it must be excluded (*see People v Allweiss*, 48 NY2d at 47).

County Court then added to this prejudicial effect by allowing evidence of Gotay's conviction and criminal involvement related to the receiving of stolen goods. The court concluded that Gotay, who remains uncharged in this case, was going to act as a "fence" for these goods merely because defendant had telephoned him at the time of the crime, and that this bare fact was sufficient to put such explosive evidence before the jury. Again, there was no evidence of what the defendant and Gotay may have said in these phone conversations. In considering the admissibility of evidence of prior crimes of third parties as part of the prosecution's case, though not strictly subject to *Molineux*, the court must be mindful of similar dangers, such as instances where prejudice outweighs probativeness and the danger of the defendant's propensity to commit the charged crime and his guilt thereof merely by association with individuals with criminal pasts.

We have not hesitated to reverse convictions affected by admission of evidence of uncharged crimes, where the prejudice to defendant was much less acute than in this case (*see People v Resek*, 3 NY3d 385, 387 [2004] [evidence that police were monitoring a car based upon a report that it was stolen could have

been dealt with by less prejudicial means, such as instructing jurors that the defendant's stop of the vehicle and arrest were lawful]; *People v Green*, 35 NY2d 437, 442-443 [1974] [the trial court erred by allowing police testimony that one month earlier they had attempted to enter defendant's apartment because of a drug complaint and the error was prejudicial]). In the recent case of *People v Giles* (11 NY3d 495, 500 [2008]), we held that evidence of prior crimes to show that a debit card was stolen was irrelevant, where there was no proof that defendant committed the prior burglaries, and the resulting prejudice required reversal of defendant's conviction in the absence of a limiting instruction by the trial court.

The majority ascribes no prejudicial effect from multiple law enforcement agents testifying as to these third parties' cargo thefts on the basis that this extensive testimony does not directly relate to defendant's criminal past. They state with confidence that the jury did not impute criminal propensity to defendant from Gotay's conviction and criminal involvement. The jury, however, would naturally have believed that, because defendant associated with a person convicted of receiving stolen goods in the recent past and was in direct communication with him at the time of this cargo theft, defendant committed the crimes charged.

Turning to harmless error, this doctrine is applicable only if two discrete factors are clear: (1) the quantum and nature of the evidence against the defendant must be great enough to excise the error, and (2) the causal effect that the error may nevertheless have had on the jury must be overcome (*see People v Crimmins*, 36 NY2d 230, 240 [1975]). Put differently, it must be established that the evidence against the defendant is overwhelming, such that it is likely that the trial error did not infect the jury's finding (*see id.* at 240-242).

Here, the majority contends that the noncollateral evidence against defendant was so compelling and overwhelming that it "exclude[s] to a virtual certainty any hypothesis of defendant's innocence" (*see* majority op at 468). The noncollateral evidence, however, was neither overwhelming nor particularly compelling. The prosecution's fingerprint evidence taken from a New York State Thruway toll ticket consisted of a partial, smudged left index fingerprint (allegedly from defendant) sharing a loop that is common to 70% of the population. The prosecution urged that this toll ticket handed to a toll booth collector on the route that the driver may have taken was from the only five-axle

truck driving that portion of the highway at around the time of the crime. The second piece of evidence was cell-site information showing that calls were made from one of defendant's cell phones that ostensibly track the same route. There was no testimony from eyewitnesses, DNA evidence, inculpatory statements by defendant, or any contraband (cash or merchandise) recovered from defendant or anyone else. This evidence was certainly not overwhelming in establishing defendant's guilt.

The prejudice to defendant, however, in allowing an FBI agent to testify as to his prior federal felony conviction, along with the underlying facts of that crime, and the admission of another federal agent's testimony regarding the facts from a previous tractor-trailer offense, is significant. Allowing the evidence that defendant contacted a federally convicted "fence" compounded the prejudicial effect of these errors. Finally, the fact that at least one fifth of this trial was dedicated to collateral matters casts serious doubts on whether defendant received a fair trial.

Nor were the errors in admitting extensive testimony of extraneous criminal acts cured by the limiting instructions. County Court's jury instruction first contains a summary of the collateral evidence against defendant, merely highlighting this wrongful evidence to the jury, and then the court told the jury that it must not view these crimes for propensity but for a common scheme or plan and as identity evidence. While the instruction may have served to highlight the wrongly admitted evidence, it certainly failed to cure the prejudice to defendant.

In conclusion, the admission of evidence regarding defendant's prior bad acts and the bad acts of third parties was highly prejudicial and served to deprive defendant of a fair trial. Where the evidence is far from overwhelming, it cannot be said that the result would have been the same if it were possible to extricate such egregious errors.

Accordingly, I would reverse defendant's judgment of conviction and direct a new trial.

Judges GRAFFEO, READ and PIGOTT concur with Judge SMITH; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN and Judge JONES concur.

Order affirmed.