[926 NYS2d 524]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JASON PAGAN, Appellant.

First Department, July 14, 2011

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Susan H. Salomon* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Beth Fisch Cohen* and *Eleanor J. Ostrow* of counsel), for respondent.

**OPINION OF THE COURT**

Abdus-Salaam, J.

Defendant, convicted of attempted murder in the second degree, assault in the first degree and two counts of criminal

possession of a weapon in the second degree, claims that his due process rights were violated when the court admitted *Molineux*[1] evidence of defendant's membership in the Latin Kings gang. We find that the evidence should not have been admitted, but that the error was harmless.

The court admitted portions of two recorded telephone calls. In one call, defendant said that he had been a Latin Kings member for four years. The second call was a conversation with defendant's aunt, during which he told his aunt to tell her boyfriend that defendant would take care of the boyfriend's problem with another person because defendant was "trying to get some status."

■ While the court reasoned that these conversations were probative because they would demonstrate an aspect of intent and motive, and "flesh out the background of what happened," we agree with defendant that these conversations lacked any probative value in view of the trial testimony, discussed infra, which clearly established intent and motive (*compare People v Edwards*, 295 AD2d 270 [2002], *lv denied* 99 NY2d 557 [2002] [evidence of defendant's gang membership was highly relevant to explain why defendant would attack an individual for no apparent reason]). Furthermore, to the extent that these conversations had any probative value, the court abused its discretion in admitting this evidence because such value was outweighed by potential prejudice (*see generally People v Ventimiglia*, 52 NY2d 350, 359-360 [1981]). Nonetheless, for the reasons stated below, we find the error to be harmless.

The victim, Carlos Salome, testified at trial that in the early hours of May 10, 2008, he was working his 10:00 P.M. to 5:00 A.M. shift as a bouncer at Sing Sing Karaoke, a Lower East Side bar. At approximately 4:00 A.M., as he was checking two people's IDs at the door, he saw a fight erupt on the street between two groups—a group of apparently drunk white men who had just left Arrow, the bar next door, and a group of four Hispanics, two men and two women, who had been walking by. According to Salome, the fight began after one of the white men directed a remark to the Hispanic group, "[L]ook at that drunk mother f. . .er," and a member of the Hispanic group replied, "[W]hat the f. . . did you say white prick?" The Hispanic group attacked the white group and they engaged in a "little brawl." Salome and an Arrow bouncer named Travis intervened to break them

1. *People v Molineux* (168 NY 264 [1901]).

up, Travis separating the Hispanics and Salome separating the white men. During the brawl, Salome noted that defendant was one of the Hispanic men. Salome recognized defendant from an incident at Sing Sing Karaoke months earlier, when defendant had tried to enter the bar using a fake ID card.[2]

The combatants eventually dispersed, but approximately 5 to 10 minutes later, the Hispanic group returned and again attacked the white men. Salome observed that defendant was one of the attackers. He also noticed that a "white skinny girl" (whom he later heard was the fiancée or wife of one of the white men) was involved in the fight, jumping on the back of a Hispanic man and pulling off his hat. Once again, Salome and Travis, now joined by a third bouncer from a club down the street, intervened to break up the fight. Salome displayed his security badge, identified himself as a bouncer who worked at the club and urged the groups to "leave it alone" and "please go home." Salome testified:

> "That's when the Hispanic girl, she be facing me, [said] '[F]. . . the police, I don't give a f. . . about the police.' I told her listen, I am not a cop, I am a bouncer, I am a security guard. I'm not an officer at all. I'm a security officer that works as a bouncer, but I am not a cop I stated to them. At that time she said, '[F]. . . the police.' "

Eventually, the Hispanic group left and the white men left in a cab.

Approximately 5 to 10 minutes after the second fight ended, two Hispanic men, one of whom was identified by Salome as defendant, and a Hispanic woman whom Salome had seen earlier, returned. Defendant walked by Salome and stared. Salome told the Hispanic group that the white group had left in a cab and that they should go home. Both defendant and the woman responded, "[F]. . . the police." Salome testified that he made eye contact with defendant during this conversation, which lasted about two or three minutes. The two men and the woman crossed to the other side of the street. Then, the white woman emerged from Sing Sing Karaoke, extremely drunk and wobbling. Salome felt immediate concern because he had mistakenly told the Hispanics that everyone had gone home. According to

---

2. During the prior encounter, Salome stood just a few feet from defendant and looked at his face, while defendant spent about 10 minutes trying to persuade Salome to admit him to the bar despite not having any valid ID showing that he was 21 years old.

Salome, the Hispanic woman pointed to the white woman and said, "[N]o, f. . . that, there goes that bitch, let's get her."

Salome observed defendant and the other man crouch behind two plastic newspaper dispensers across the street, about 30 feet away. Defendant then produced a gun and pointed it in Salome's direction. The other man did not have anything in his hands. Salome heard two "loud bangs" that sounded like gunshots, and then a third one. After the third shot, as Salome describes it,

> "I stated in my head, in my head I was thinking I'm not going to jump in front of this lady. I have five kids, but I wasn't thinking with my head, my body reacted in a different way. After the third shot, I ran and jumped in front of the lady and I picked her up to throw her back in the establishment, I was struck."

Salome was shot in the chest and grievously injured.

After the shooting, Detective Joseph Lombardi responded to Sing Sing Karaoke and interviewed witnesses. Salome was not able to speak to Lombardi at that time. The police distributed flyers about the shooting, and received an anonymous call that a woman, subsequently identified as Elizabeth Sullivan, had information about the fight leading up to the shooting. On May 19th, Lombardi spoke to Ms. Sullivan and Jerry Hrebluk in their fifth-floor apartment on the southwest corner of Avenue A and Sixth Street. They told Lombardi that on the night of the shooting, they had been home and heard a fight break out on Avenue A. They looked out their window and observed that defendant and other Hispanic men were fighting with a group of white men. Both Sullivan and Hrebluk recognized defendant, whom they knew as "Jason," from their years of living in the neighborhood. They provided Lombardi with an address for Jason, and told him that Jason's mother's name is Lucy. They told Lombardi that after they saw the commotion, they moved away from the window. When they later heard gunshots they were no longer looking out the window and did not see who was shooting.[3]

After Lombardi met with Salome on May 28, 2008, and based upon the information gathered from Salome, Sullivan, and Hre-

---

**3.** Before trial, the court conducted a *Sirois* hearing (*see Matter of Holtzman v Hellenbrand*, 92 AD2d 405 [1983]) at which Sullivan, Hrebluk and Detective Lombardi testified. Sullivan testified that defendant's mother Lucy had twice approached her and called her a snitch and warned that there

bluk, defendant became the suspect. Lombardi learned that defendant was living in Phoenix House, a residential drug facility in the Bronx, and arranged for defendant to meet with him at the 9th Precinct. Defendant was given *Miranda* warnings and agreed to speak to Lombardi. The detective showed defendant a photograph of Sing Sing Karaoke, and asked if defendant knew where the place was located. Defendant said that it was a bar up the street from where he lived. Lombardi then showed defendant a photograph of the window at the bar, and when asked if he knew what that was, defendant responded, "[O]h, they look like bullets." Finally, Lombardi showed him a photograph of Carlos Salome in the hospital with tubes all over him and asked if defendant knew who that was. Defendant said, "[O]h, shit, oh shit, that is Carlos, what happened, he got shot, did he break up a fight or something?" Prior to defendant making these statements, Lombardi had not mentioned Carlos Salome's name or told defendant that he was investigating a shooting, but had only told defendant that he was investigating a case. At the end of the conversation, defendant said to Lombardi, "I know Carlos, why would I shoot Carlos? He is my boy."

Later that day, Salome and Heriberto Collado (a man who worked as a bouncer at a different bar on the same block, and who had been on the street the night of the shooting) viewed a lineup. Salome identified defendant, and had no doubt in his mind that defendant was the man who had shot him. Collado selected a filler as the person who had been involved in the fight.

---

would be repercussions. At the hearing, Sullivan and Hrebluk denied ever having identified Jason as the man involved in the fight. Detective Lombardi testified that Hrebluk had told him that Sullivan was afraid for her life, that both of them were scared because they know Jason is a Latin King, and that they told Lombardi they didn't want to testify and that they were changing their story to say that someone who "looked" like Jason was involved in the fight. The court determined that Sullivan and Hrebluk were "unavailable" and that defendant's misconduct had caused their unavailability. Consequently, Lombardi was permitted to testify to the out-of-court statements made by these witnesses. He also testified about what Sullivan had reported to him about her two encounters with defendant's mother Lucy. The court instructed the jurors that this testimony was introduced for the limited purpose of proving that defendant had a consciousness of guilt. The court instructed that the jury first needed to determine whether it believed that the threats occurred, and if so, it needed to decide whether the threats demonstrated defendant's consciousness of guilt. The court charged that if the jurors found defendant's conduct was solely motivated by consciousness of guilt, they could consider the evidence for that limited purpose only, but if they found that there were two inferences that could be drawn from the conduct, they were required to draw the inference of lack of guilt.

The defense offered an alibi defense, calling two employees of Phoenix House. Defendant had entered that facility shortly before the crime was committed. According to the employees who worked the night shift, they conducted a nightly roll call at approximately 11:30 P.M. After the residents were required to retire to their rooms, the employees performed hourly room and bed counts, using a flashlight while standing by the rooms to look inside to see whether there was a body in the bed. They did not wake the residents or touch them, or necessarily look at the residents' faces. There was no security guard at the facility. According to these employees, the Phoenix House records from May 9-10, 2008 showed that defendant attended the roll call and that all residents were present for the head counts.

On rebuttal, the People called Alan Williamson, the director of Phoenix House. He had been the deputy director in May 2008. He testified that Phoenix House was "not a prison setting" and that there were "several occasions" when people had left the facility without authorization "through multiple ways." Williamson testified that there were at least seven or eight exits to the building, and that a resident, despite having no authorization to do so, could exit through the front door (which was staffed by a fellow resident), climb over a wall, or descend a fire escape.

The trial court erred in admitting the taped phone conversations as *Molineux* evidence because the circumstances of the crime manifested the shooter's motive and intent. The evidence showed that Salome took an instrumental role in breaking up the fights between the Hispanic group and the white men. As is pointed out by the People in their brief, the jury could have easily inferred that defendant was angry at Salome for his involvement, or was enraged at Salome when defendant saw the white woman emerge from the bar after Salome had told defendant and the others who returned with defendant that all of the white group had gone home. The evidence also raised the real possibility that after the Hispanic woman yelled out to get the "bitch," defendant intended to shoot the white woman but instead shot Salome when he stepped in front of her.

Thus, there was no sound reason for admitting the conversations in order to, as the trial court stated, "flesh out the background of what happened." Although the court cited *People v Edwards* (295 AD2d 270 [2002], *lv denied* 99 NY2d 557 [2002]) and *People v Tai* (224 AD2d 328 [1996], *lv denied* 88 NY2d 942 [1996]) in support of its ruling, the circumstances in those cases are starkly distinct from those here.

In *Edwards*, evidence of gang membership and expert testimony that the gang to which defendant belonged engaged in random ritual slashings was highly relevant to explain "why defendant, for no apparent reason, would suddenly attack a fellow occupant of a holding cell who had never seen defendant before" (295 AD2d at 271). Here, there was an obvious explanation for why, considering the events that had transpired prior to the shooting, defendant would want to harm Salome and/or the white woman. Likewise, in *Tai*, evidence of defendant's gang associations was highly probative of motive and intent "given his apparent lack of personal hostility toward the victims" (224 AD2d at 328). In contrast, defendant's personal hostility toward Salome and/or the white woman is easily understood given the circumstances preceding the shooting.

As noted by defense counsel in the appellate brief, "[T]he crime itself was 'senseless' only in the sense that all violent crime is. In fact, its genesis was sadly all-too-common—a toxic mix of drunken and race-tinged insults that unfortunately escalated with the use of weapons." This is distinct from the situation in *People v Wilson* (14 AD3d 463 [2005], *lv denied* 4 NY3d 857 [2005]), where evidence of gang affiliation was highly probative of motive and central to understanding an otherwise unexplained assault.

██ Despite the trial court's erroneous admission of the telephone conversations, we find the error harmless. "An error may be found harmless where 'the proof of defendant's guilt, without reference to the error, is overwhelming' and where there is no 'significant probability . . . that the jury would have acquitted the defendant had it not been for the error' " (*People v Gillyard*, 13 NY3d 351, 356 [2009] [citation omitted]). Here, the prosecution presented the complainant's uncontested account of the shooting and his identification of defendant as the perpetrator (*id.*; *compare People v McKinney*, 24 NY2d 180, 185 [1969] [defendant denied assaulting the complainant and the resolution of defendant's guilt hinged on whether the jury believed the complainant's or defendant's version of events]). There was also proof that Salome had two encounters with defendant merely minutes before the shooting; that Salome recognized defendant from a prior encounter months earlier when Salome, a bouncer whose job is to closely examine IDs, had a 10-minute face-to-face conversation with defendant; that neighbors had seen defendant involved in the fight preceding the shooting, thus placing defendant at the scene in conflict

with his alibi defense; that defendant had intimidated these witnesses to make them "unavailable" to testify, evincing a consciousness of guilt; and that defendant made incriminating statements to Detective Lombardi when shown the pictures of Salome in the hospital, showing his knowledge of the events leading up to and including the shooting.

We do not see any likelihood that the jury would have acquitted defendant if it had not heard the improperly admitted conversations (*see People v Arafet*, 13 NY3d 460, 468 [2009]). Furthermore, the court's repeated and extensive instructions to the jury concerning the limited purpose of the *Molineux* evidence minimized the potential for prejudice (*see People v Hutchinson*, 179 AD2d 679 [1992], *lv denied* 79 NY2d 1002 [1992]; *see also People v Tai*, 224 AD2d at 329).[4] Thus, we conclude that the error was harmless (*Arafet* at 466-468).

Regarding defendant's other arguments, the verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). There is no basis for disturbing the jury's credibility determinations.

■ The court properly denied defendant's challenge for cause to a prospective juror. The panelist's responses, when taken in context and viewed as a whole, did not cast doubt on his ability to reach a fair and impartial verdict (*see People v Chambers*, 97 NY2d 417, 419 [2002]). The gist of the panelist's position, even if inartfully stated, was that while he disapproved of gang members, this view would not affect his ability to decide the case solely on the evidence. We note that defendant did not avail himself of the opportunity to ask follow-up questions.

Defendant's remaining arguments regarding the evidence of gang membership, including his constitutional claims, are unpreserved and we decline to review them in the interest of justice. As an alternative holding, we also reject them on the merits.

Accordingly, the judgment of the Supreme Court, New York County (Marcy L. Kahn, J.), rendered December 10, 2009, convicting defendant, after a jury trial, of attempted murder in the second degree, assault in the first degree and two counts of

---

4. The potential for prejudice was also minimized in the jury selection process, during which the jurors were vetted by being informed that there would be evidence that defendant is a member of the Latin Kings, and asked if this would impact on their ability to not prejudge the case and to be impartial in assessing the evidence. Those prospective jurors who indicated a problem were discharged.

criminal possession of a weapon in the second degree, and sentencing him, as a second violent felony offender, to an aggregate term of 23 years should be affirmed.

SAXE, J.P., CATTERSON, ACOSTA and ROMÁN, JJ., concur.

Judgment, Supreme Court, New York County, rendered December 10, 2009, affirmed.