People v Clayton (2019 NY Slip Op 06284)





People v Clayton


2019 NY Slip Op 06284


Decided on August 22, 2019


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 22, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., SMITH, CARNI, CURRAN, AND TROUTMAN, JJ.


548 KA 18-01340

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
THOMAS S. CLAYTON, DEFENDANT-APPELLANT. 






EASTON THOMPSON KASPEREK SHIFFRIN LLP, ROCHESTER (BRIAN SHIFFRIN OF COUNSEL), FOR DEFENDANT-APPELLANT.
WEEDEN A. WETMORE, SPECIAL DISTRICT ATTORNEY, ELMIRA, FOR RESPONDENT. 


 Appeal from a judgment of the Steuben County Court (Peter C. Bradstreet, J.), rendered April 24, 2017. The judgment convicted defendant, upon a jury verdict, of murder in the first degree and murder in the second degree. 
It is hereby ORDERED that the judgment so appealed from is modified on the law by reversing that part convicting defendant of murder in the second degree and dismissing count two of the indictment and as modified the judgment is affirmed.
Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of murder in the first degree (Penal Law § 125.27 [1] [a] [vi]; [b]) and murder in the second degree (§§ 20.00, 125.25 [1]).
Shortly after midnight on Tuesday, September 29, 2015, defendant returned home from a poker game to find his wife dead on the kitchen floor. An investigation led the police to suspect that defendant's former employee and tenant (principal) had bludgeoned her to death with a maul handle. Defendant was charged with, inter alia, murder in the first degree on the ground that he "procured commission of the killing pursuant to an agreement" with the principal to commit the killing "for the receipt, or in expectation of the receipt, of" a thing of "pecuniary value" (Penal Law § 125.27 [1] [a] [vi]).
Several women testified at trial that they were having sex with defendant while he and the victim were married. Defendant made disparaging remarks about the victim to some of those women, and he told at least one of them that "he couldn't divorce [the victim] because she would take everything." Approximately one year before the murder, defendant increased the limit on the victim's life insurance policy from $500,000 to $1,000,000. A few weeks after that, he told the victim's niece: "[T]his [is] going to be the last Christmas with [me] around and us being together as a family."
Defendant had employed the principal at his businesses for years, during which time the principal often performed work around the home where defendant and the victim lived with their children. The principal was thus familiar with that property. The principal did not own a vehicle and did not have a driver's license. Twelve days before the murder, defendant's business partner terminated the principal's employment with the company. At the time of the principal's termination, he was living in an apartment in Elmira that was co-owned by defendant but, after the loss of his job, the principal could no longer afford to pay the rent. Over the next 12 days, defendant referred the principal to employers and bought the principal a bicycle, ostensibly to use as a mode of transportation to and from potential jobs. During that time, defendant and the principal had frequent telephone contact, the extent of which was detailed exhaustively at trial using cell phone records.
Six days before the murder, someone from defendant's company called the storage facility located next door and asked whether the company's property was within range of the storage facility's surveillance cameras. In fact, the company's parking lot was within range of the cameras, and surveillance footage from the night of the murder was played for the jury at trial.
Three days before the murder, defendant called an acquaintance and asked him whether there were surveillance cameras outside a certain inn located in Elmira. The acquaintance was not aware of any cameras, but offered to check. Defendant declined that offer.
On the night of the murder, defendant drove one of the company's trucks to his weekly poker game. Defendant's personal truck was not in his possession because he and one of his employees had temporarily exchanged trucks earlier that day, ostensibly to facilitate the unloading of an all-terrain vehicle (ATV) the employee had borrowed from defendant over the weekend. Surveillance footage showed defendant's personal truck leaving the parking lot around noon, presumably driven by the employee. The employee's maroon truck left the lot at 3:09 p.m. with the ATV in the back. When the maroon truck returned at 6:04 p.m., the ATV was no longer in the back, presumably having been unloaded by defendant. A few minutes later, a company truck and the maroon truck left the lot.
Defendant arrived at his poker game in the company truck around 8:00 p.m. During the poker game, he used his cell phone to look at social media. Sometime after 10:00 p.m., he asked his host's wife if he could use her cell phone to call a worker, claiming that he had left his cell phone in his truck. Defendant took the borrowed phone into an adjacent hallway, placed a call to the principal, engaged him in hushed conversation, and then deleted the call from the phone before returning it to its owner.
The principal picked a witness up that night in a maroon truck. They drove to the outskirts of Corning before pulling the truck to the side of the road. The witness stayed inside the truck as a lookout while the principal took an object from the bed of the truck and walked off. Approximately 15 minutes later, the principal returned, breathless, sweating, and carrying a stick. On the way back to Elmira, the principal stopped the truck and threw the stick off to the side of the road. They drove a bit farther, and, when they came to a bridge near water, the principal slowed the truck so the lookout could throw a bag of clothes into the water. Surveillance footage showed a truck returning to the company's parking lot at 12:55 a.m. A few minutes later, someone rode away on a bicycle.
Defendant left the poker game around midnight, found the victim's lifeless body, and summoned the police. Observing no sign of forced entry, investigators immediately suspected defendant of committing the murder and took him to the police station for questioning around 4:30 a.m. Before the patrol car had left the driveway, defendant told investigators: "[W]ell, you'll know where I am because my vehicle has GPS on it."
A few weeks after the murder, investigators recovered a bag from a swampy area located approximately 40 feet from the inn in Elmira with respect to which defendant had previously inquired about the presence of surveillance cameras. The bag contained clothes, and genetic testing determined that the principal's DNA was on the clothes.
We reject defendant's contention that the evidence is legally insufficient to establish that he "procured commission of the killing pursuant to an agreement" with the principal (Penal Law § 125.27 [1] [a] [vi]). Although the case against defendant is circumstantial, the standard of review for determining whether a conviction is supported by legally sufficient evidence "is the same for circumstantial and non-circumstantial cases—whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (People v Grassi, 92 NY2d 695, 697 [1999], rearg denied 94 NY2d 900 [2000]; see People v Marvin, 162 AD3d 1744, 1745 [4th Dept 2018], lv denied 32 NY3d 1066 [2018]). Here, there was ample evidence from which a jury could have inferred that the principal killed the victim at the behest of defendant, who provided the principal with key logistical support. Viewing the evidence in the light most favorable to the People (see People v Contes, 60 NY2d 620, 621 [1983]), we conclude that there is " a valid line of reasoning and permissible inferences from which a rational jury' " could have found the [*2]existence of such an agreement (People v Danielson, 9 NY3d 342, 349 [2007]; see § 125.27 [1] [a] [vi]). For the same reasons, we conclude that there is legally sufficient evidence that defendant, acting with the "intent to cause the death" of the victim, requested that the principal commit the killing or intentionally aided the principal in the commission thereof (§ 125.27 [1]; see § 20.00; People v Glanda, 5 AD3d 945, 948-949 [3d Dept 2004], lv denied 3 NY3d 640 [2004], reconsideration denied 3 NY3d 674 [2004], cert denied 543 US 1093 [2005]; see generally People v Mateo, 2 NY3d 383, 405 [2004], cert denied 542 US 946 [2004]).
We reject defendant's further contention that the evidence is legally insufficient to establish that, pursuant to the agreement, the principal committed the killing "for the receipt, or in expectation of the receipt, of" a thing of "pecuniary value" (Penal Law § 125.27 [1] [a] [vi]). The People identify several things of pecuniary value that defendant offered to the principal, including a bicycle, a promise to pay an outstanding fine, and referrals for new employment. Indeed, there is no dispute that, in the days leading up to the murder, defendant gave the principal a bicycle, which was not only a thing of pecuniary value but also an instrumentality in the crime. Moreover, cell phone records establish that the principal sent defendant a text message five days before the murder asking for "a little bit." In our view, that message, read in context, could be construed as a request for money. A rational jury thus could have inferred, in light of the principal's subsequent actions, that defendant procured commission of the killing by making an agreement pursuant to which the principal would kill the victim in exchange for something of pecuniary value (see generally Danielson, 9 NY3d at 349).
We and our dissenting colleagues agree on many points. All of us agree that there was sufficient evidence that defendant was complicit in his wife's murder. Further, all of us agree that there is evidence that the principal requested a payment of money from defendant only five days before the murder. Nevertheless, our dissenting colleagues characterize that request as "part of a string of otherwise innocent interactions" between defendant and the principal in the days leading up to the murder. The dissent even offers the possibility that the principal was "seeking a reward" from defendant—not for agreeing to murder defendant's wife, but for unrelated virtuous conduct. We cannot agree. In our view, the jury could rationally have concluded that the principal's request for a payment of money five days before the murder was not "innocent" at all, but in fact was part and parcel of the murder plot.
Contrary to defendant's contention, viewing the evidence in light of the elements of the crime of murder in the first degree as charged to the jury (see Danielson, 9 NY3d at 349), we conclude that the verdict is not against the weight of the evidence with respect to that count (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
Although not raised by defendant, the count charging him with intentional murder in the second degree must be dismissed as a lesser included count of murder in the first degree (see CPL 300.40 [3] [b]; People v Pierre, 37 AD3d 1172, 1173 [4th Dept 2007], lv denied 8 NY3d 989 [2007]). Therefore, we modify the judgment accordingly. In light of that determination, we need not reach defendant's contentions concerning the weight and sufficiency of the evidence with respect to the murder in the second degree conviction.
Additionally, even though defendant contends that the People's untimely disclosure of Rosario material requires reversal, that contention is not preserved for our review because defendant "failed to make appropriate timely objections when the alleged violations came to his attention" (People v Brandl, 231 AD2d 895, 895 [4th Dept 1996]). In any event, the contention lacks merit because defendant failed to establish substantial prejudice as a result of the belated disclosure (see generally People v Martinez, 71 NY2d 937, 940 [1988]).
Defendant next contends that County Court erred in denying his request for a Frye hearing (see Frye v United States, 293 F 1013 [DC Cir 1923]) with respect to the admission of the cell phone tracking evidence. We reject that contention because the testimony of the People's expert "did not concern a novel scientific theory, technique, or procedure, but instead involved deductions made from cell phone site data in a manner consistent with a generally accepted scientific process" (People v Littlejohn, 112 AD3d 67, 73 [2d Dept 2013], lv denied 22 NY3d 1140 [2014]; see generally People v Arafet, 13 NY3d 460, 463-464 [2009]). For the same reason, the court properly denied defendant's request for a Frye hearing with respect to the GPS evidence (see Matter of Carniol v New York City Taxi & Limousine Commn., 126 AD3d 409, [*3]410-411 [1st Dept 2015]).
Contrary to defendant's final contention, the court properly denied his motion to set aside the verdict pursuant to CPL 330.30 (3) without a hearing because " the purported newly discovered evidence merely tended to impeach or discredit trial testimony' " (People v Brewer, 50 AD3d 1577, 1577-1578 [4th Dept 2008], lv denied 11 NY3d 786 [2008]; cf. People v Bryant, 117 AD3d 1586, 1587 [4th Dept 2014]).
All concur except Whalen, P.J., and Carni, J., who dissent and vote to modify in accordance with the following memorandum: Although we agree with the majority with respect to defendant's contentions regarding the untimely disclosure of Rosario material, the denial of his requests for Frye hearings and the denial of his CPL 330.30 motion, we respectfully dissent with respect to the legal sufficiency of the evidence concerning the pecuniary agreement element of murder in the first degree (Penal Law § 125.27 [1] [a] [vi]; [b]). The majority concludes that there is legally sufficient evidence supporting that element, i.e., evidence that defendant procured commission of the killing by making an agreement pursuant to which the principal would kill the victim in exchange for a bicycle, referrals to menial jobs, and an unknown amount of money. They conclude that such an agreement as to money was established by a single text that the principal sent to defendant five days before the murder, which reads, in its entirety: "need that eviction notice and a letter of release and a little bit please." Although we agree with the majority that the "little bit" language could be construed as a request for money, in our view the context in which that text was sent renders speculative any inference that the principal's request was made as part of a murder-for-hire agreement. In particular, the principal had been fired from his job at defendant's company just days before he sent the text, and defendant was in the process of evicting the principal and his family from their residence, which defendant owned. The text at issue was part of a string of otherwise innocent interactions between the principal and his former employer/landlord in which they discussed details relating to those events and discussed the principal's need to obtain documentation of the eviction and termination in order to apply for government benefits. Additionally, the principal had recently accused a former coworker, now working at a rival company, of stealing equipment from defendant, and the principal may thus have been seeking a reward from defendant. The text is suspicious but, standing alone—or standing together with the gift of the bicycle and the unsuccessful job referrals—it is not legally sufficient in our view to prove that defendant procured commission of the killing pursuant to an agreement with the principal to kill the victim "for the receipt, or in expectation of the receipt, of" a thing of "pecuniary value" (§ 125.27 [1] [a] [vi]). Any inference that the jury could have drawn to the contrary would have been speculative inasmuch as the "jury could [not] rationally have excluded innocent explanations of the evidence offered by the defendant" (People v Reed, 22 NY3d 530, 535 [2014], rearg denied 23 NY3d 1009 [2014]). We therefore disagree that the evidence is legally sufficient to support the conviction of murder in the first degree.
We conclude, however, that the People presented legally sufficient evidence of defendant's shared intent with the principal and therefore that the evidence is legally sufficient to support defendant's conviction of murder in the second degree (Penal Law §§ 20.00, 125.25 [1]; see generally People v Danielson, 9 NY3d 342, 349 [2007]). Viewing the evidence in light of the elements of the crime of murder in the second degree as charged to the jury (see Danielson, 9 NY3d at 349), we further conclude that the verdict with respect to that crime is not against the weight of the evidence (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
Although defendant does not raise the issue, murder in the second degree is a lesser included offense of murder in the first degree, and County Court erred in failing to submit the counts to the jury in the alternative (see CPL 300.40 [3] [b]; see generally People v Miller, 6 NY3d 295, 300 [2006]). However, because we would dismiss the greater charge, defendant would not be prejudiced by that error (see People v Pittman, 33 AD3d 1118, 1120 [3d Dept 2006]). Further, we conclude that, "[i]nasmuch as a jury already has made . . . a determination [regarding murder in the second degree] and its verdict is legally sufficient and is fully supported by the weight of the evidence, there is no reason to remit th[at] charge[] for retrial" (id.).
We would therefore modify the judgment by reversing that part convicting defendant of murder in the first degree and dismissing count one of the indictment, and we would otherwise affirm.
Entered: August 22, 2019
Mark W. Bennett
Clerk of the Court