[999 NE2d 160, 976 NYS2d 682]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHADON MORRIS, Appellant.

Argued September 4, 2013; decided October 15, 2013

## POINTS OF COUNSEL

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Barry Stendig* of counsel), for appellant. Appellant was deprived of his right to a fair trial when the court admitted, over objection, a 911 call reporting an uncharged gunpoint robbery committed by a man whose description, according to police testimony, fit appellant even though appellant admitted that he possessed the gun charged in the indictment and the defense made it clear it would not challenge the propriety of the police conduct. (*People v Cass*, 18 NY3d 553; *People v Lewis*, 69 NY2d 321; *People v Ventimiglia*, 52 NY2d 350; *People v Santarelli*, 49 NY2d 241; *People v Allweiss*, 48 NY2d 40; *People v Arafet*, 13 NY3d 460; *People v Alvino*, 71 NY2d 233; *People v Molineux*, 168 NY 264; *People v Tosca*, 98 NY2d 660.)

*Richard A. Brown, District Attorney*, Kew Gardens (*Rebecca Height, Robert J. Masters* and *John M. Castellano* of counsel), for respondent. The court properly admitted the 911 call and related testimony as background, to complete the narrative, and to help the jury understand the disputed actions of the police during the encounter in which the weapon was recovered. (*People v Resek*, 3 NY3d 385; *People v Scarola*, 71 NY2d 769; *People v Lewis*, 69 NY2d 321; *People v Giles*, 11 NY3d 495; *People v Alvino*, 71 NY2d 233; *People v Allweiss*, 48 NY2d 40;

*People v Till*, 87 NY2d 835; *People v Alfaro*, 19 NY3d 1075; *People v Gamble*, 18 NY3d 386; *People v Dorm*, 12 NY3d 16.)

## OPINION OF THE COURT

Abdus-Salaam, J.

In *People v Tosca* (98 NY2d 660 [2002]) and *People v Resek* (3 NY3d 385 [2004]), we held that a trial court may, in its discretion, admit evidence of uncharged crimes to provide background information explaining the police actions to the jury if the probative value of the evidence outweighs the prejudice to the defendant, and the evidence is admitted with proper limiting instructions. Our application of these principles led to opposite outcomes in those cases: in *Tosca*, we held that the trial court did not abuse its discretion by allowing police testimony describing an uncharged crime (*see* 98 NY2d at 661); in *Resek*, we determined that the prejudicial value of such testimony, admitted with inadequate jury instructions, exceeded its probative worth (*see* 3 NY3d at 387).

Relying on *Resek*, defendant challenges the trial court's decision to allow the People to introduce a recording of a 911 telephone call reporting that a person matching defendant's description committed an uncharged gunpoint robbery, and police testimony describing the radio run they received about the call. We conclude that, under the circumstances of this case, the trial court did not abuse its discretion by permitting this evidence to be admitted, along with several thorough limiting instructions, as background information to explain the aggressive police action toward defendant.

## I

The undisputed facts are as follows. Just after midnight on May 25, 2007, a 911 caller reported that a black male, wearing a white t-shirt with red sleeves, dark pants, and a white Band-aid on his chin, pulled a gun and stole the caller's chain necklace at Beach 21st Street and Elk Drive in Far Rockaway. The caller stated that the perpetrator was with two other black males and that, after the attack, all three men walked down Beach 20th Street toward a CVS store on Seagirt Boulevard.

Police Officers Glenn Ziminski and Edward Moore were on routine patrol in Far Rockaway when they received a radio run from central dispatch reporting the gunpoint robbery. The dispatcher relayed the 911 caller's description of the robber, his possible location, and that he was with two other black males.

The officers responded immediately, driving their marked patrol car with lights and siren activated until they reached Beach 20th Street, where they observed defendant. Having determined that defendant appeared to fit the description conveyed in the radio run, the officers turned their lights and siren off and pulled alongside him. They exited the patrol car and ordered defendant to approach.

What occurred next was contested at trial, but there is no question that the officers acted aggressively toward defendant. Their actions included, at a minimum, grabbing defendant as he approached and forcibly pressing him against the patrol car. The officers ultimately recovered a .22 caliber Beretta semiautomatic pistol either on or near defendant's person. Defendant was arrested and later indicted for resisting arrest (*see* Penal Law § 205.30) and two counts of criminal possession of a weapon in the second degree, one charging possession with intent to use the gun unlawfully (*see* Penal Law § 265.03 [1] [b]), and one charging possession not in his home or place of business (*see* § 265.03 [3]).

Prior to trial, the People asked the trial court to permit them to introduce a recording of the 911 call and to allow the officers to testify that they stopped defendant because he matched the description relayed in the radio run. The People urged that this evidence would complete the narrative of the arrest and explain the aggressive police actions to the jury, which would be called upon to assess the officers' conduct and credibility.[1] Defendant objected, arguing that the evidence lacked probative value because he planned to admit that he possessed the gun recovered by the police. He also contended the evidence was prejudicial to his defense of temporary innocent possession. Defendant suggested that, rather than admit the 911 evidence, the court merely explain to the jury that "the reasoning for the defendant's stop has been dealt with, [and] is not a matter for your concern," and limit the police officers' testimony on the subject to the following statement: "Pursuant to a radio run, we stopped defendant."

The court ruled that the 911 evidence could be introduced at trial with appropriate limiting instructions. Balancing the probative value of the evidence against its potential prejudice,

---

1. The People also revealed that, although the 911 caller identified defendant in a showup while defendant was being held at the scene of the arrest, he had since become unreachable and would not be testifying at trial.

the court determined that the 911 call provided necessary background information that put the police actions in proper context for the jury. Without that background information, the court feared the jury would engage in "rampant speculation that the defendant . . . was just singled out as a young Black male in Queens . . . harassed by the police for no good reason." Suppressing the evidence and issuing defendant's proposed jury instruction, the court reasoned, would not deter such speculation. The court ruled, however, that if defendant took the stand, the People could not cross-examine him about any details concerning the uncharged robbery to challenge his credibility.

During trial, the court gave four limiting instructions to the jury regarding its consideration of the 911 evidence.[2] Each instruction emphasized that the evidence was being admitted solely "to explain the police actions in this case" and not for the truth of what the 911 caller said or to prove that defendant committed a gunpoint robbery. Critically, after the People played the recording of the 911 call, the court told the jury:

> "Those statements from the individual that you heard on the 911 CD, they are not being admitted at this trial for the truth of what that person is saying to the 911 dispatcher. Indeed, if you hear any further testimony at this trial relative to those statements made by that caller, that evidence is not being admitted for the truth of what the caller is saying to the 911 dispatcher. As I told you yesterday, that evidence is admitted now and any further evidence related to this issue is admitted for a specific, limited purpose. The evidence is being admitted to explain the police actions, to explain what [they] did . . . after getting those transmissions or getting at least the substance of those transmissions relayed to that. That's the only reason it's being admitted. I am cautioning you again, that the defendant is not on trial for robbery. He's not on trial for robbery with a gun and you have to keep all of that in mind."

The People presented testimony from, among other witnesses, Officers Ziminski and Moore, who each testified that they

---

2. The court issued limiting instructions after (1) the People referenced the 911 call in their opening statement, (2) the jury first heard the recording of the 911 call (and received a transcript as a demonstrative aid), (3) Officer Ziminski testified that he received a radio run about a gunpoint robbery, and (4) the People played the 911 call during their summation.

stopped defendant because he matched the description in the radio run.[3] The officers stated that they observed defendant walking with two black males near the reported location along Beach 20th Street toward Seagirt Boulevard. Ziminski grabbed defendant as he approached and held him against the patrol car, while Moore frisked defendant's clothing, recovering the gun from a rolled-up cuff of his sweatpants. While the officers were examining the gun, defendant allegedly attempted to flee but was caught by Ziminski. A struggle ensued as the officers attempted to handcuff defendant, which ended with Ziminski tackling defendant to the ground. On cross-examination, the officers admitted that they did not recover a chain from defendant or any of the men (the other two men were frisked but not arrested), or retrieve the white Band-Aid, which they testified fell off defendant's chin during the struggle.

Defendant took the stand to present his temporary innocent possession defense, stating that he found the gun on the ground near the CVS store and that he intended to notify the police about it after returning home. These plans were thwarted, however, when the officers stopped him just minutes later on Beach 20th Street. Defendant indicated that he was alone at the time of the police stop, and that he was walking toward Plainview Avenue (rather than toward Seagirt Boulevard as the officers testified).

Defendant's description of the police encounter differed in significant respects from that of the officers. According to defendant, he was trying to tell the officers that he had just found the gun when they pushed him down and grabbed his waist, causing the gun to fall on the ground. The officers then pressed him against the patrol car; defendant denied ever taking his hands off the car and stated that he merely turned his head in shock when the officers said he was "going down for a robbery." The officers allegedly reacted by striking defendant on the back of the head, jumping on him, and hitting him several times in the face, causing injuries that required hospitalization and stitches.

Instructed on the defense of temporary innocent possession of a firearm, the jury returned a verdict acquitting defendant of

---

**3.** When Officer Ziminski referenced the radio run, the court stated to the jury: "I reiterate that same instruction, we are not trying a robbery. This testimony is not being offered for the truth that a robbery in fact took place, but just to explain [Officer Ziminski's] actions in response to getting a radio run as to an alleged robbery."

the criminal possession of a weapon count charging possession with intent to use the gun unlawfully, but convicted defendant of the count charging possession not in his home or place of business. Defendant was also acquitted of resisting arrest. He was sentenced to a determinate prison term of five years, to be followed by five years of postrelease supervision.

Defendant appealed and the Appellate Division affirmed the judgment of conviction (89 AD3d 1112 [2d Dept 2011]). Citing our decisions in *Tosca* and *Resek*, the Appellate Division held that the trial court's admission of the 911 evidence did not deprive defendant of a fair trial because that evidence was properly admitted to provide background information, had a greater probative value than prejudicial effect, and was accompanied by several limiting instructions (*see id.* at 1112-1113). Defendant now appeals pursuant to leave granted by a Judge of this Court (19 NY3d 964 [2012]), and we now affirm.

## II

We begin with the familiar proposition that evidence of uncharged crimes is inadmissible where its purpose is only to show a defendant's bad character or propensity towards crime (*see e.g. People v Arafet*, 13 NY3d 460, 465 [2009]; *People v Giles*, 11 NY3d 495, 499 [2008]; *People v Alvino*, 71 NY2d 233, 241 [1987]). However, "[w]hen evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused" (*People v Allweiss*, 48 NY2d 40, 47 [1979]).

*People v Molineux* (168 NY 264 [1901]) prescribes five well-recognized, nonpropensity purposes for which uncharged crimes may be relevant (*see Alvino*, 71 NY2d at 242 ["to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant"]; *see also e.g. People v Ventimiglia*, 52 NY2d 350, 359 [1981]; *Molineux*, 168 NY at 293). The *Molineux* categories are not exhaustive, however (*see People v Santarelli*, 49 NY2d 241, 248 [1980]), and we have held that evidence of prior, uncharged crimes may also be relevant to complete the narrative of the events charged in the indictment (*see e.g. People v Till*, 87 NY2d 835, 837 [1995]; *People v Gines*, 36 NY2d 932, 932-933 [1975]), and to provide necessary background information (*see e.g. Till, supra*; *People v Green*, 35 NY2d 437, 442 [1974]; *see also Resek*, 3 NY3d at 390; *Tosca*, 98 NY2d at 661).

Even if the uncharged crimes evidence meets the relevancy threshold (*see People v Cass*, 18 NY3d 553, 560 [2012]), it is admissible "only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant" (*Till*, 87 NY2d at 836-837; *see e.g. Cass, supra*). This inquiry involves "one of balancing in which both the degree of probativeness and the potential for prejudice of the proffered evidence must be weighed against each other" (*Ventimiglia*, 52 NY2d at 359-360, citing *Santarelli*, 49 NY2d at 248, and *Allweiss*, 48 NY2d at 47). Weighing the evidence's probative value against its potential prejudice to the defendant is a matter of discretion for the trial court (*see Cass*, 18 NY3d at 560 n 3). Accordingly, "our review is limited to determining whether the trial court abused its discretion" (*id.*, citing *People v Hudy*, 73 NY2d 40, 55 [1988], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]; *Alvino*, 71 NY2d at 242).

In *Tosca*, we held that the trial court did not abuse its discretion by admitting uncharged crime evidence as background information to explain the police actions (98 NY2d at 661, *affg* 287 AD2d 330 [2001]). During Tosca's trial on a charge of criminal possession of a weapon in the third degree, the trial court allowed a police officer to testify that, shortly before the defendant was arrested, an unidentified livery cab driver "had reported an encounter with [the] defendant involving a gun" (*Tosca*, 287 AD2d at 330). The defendant was convicted and the Appellate Division affirmed, concluding that the police officer's "testimony was necessary to complete the narrative and to explain the aggressive nature of the police confrontation with defendant" (*id.*). We agreed that the testimony was properly admitted "not for its truth, but to provide background information as to how and why the police pursued and confronted defendant" (*Tosca*, 98 NY2d at 661, citing *Till*, 87 NY2d at 837). Further, any prejudice was ameliorated by "the trial court twice explicitly instruct[ing] the jury on the limited use it could make of the testimony and that the testimony was not to be considered proof of the uncharged crime" (*id.*).

Two years after *Tosca*, we applied these principles in *Resek* and determined that admission of uncharged crime evidence deprived the defendant of a fair trial (*see* 3 NY3d at 387). There, the grand jury indicted the defendant for criminal possession of a controlled substance with intent to sell, but failed to indict on a charge of criminal possession of a stolen car (*see id.*). The trial

court permitted two police officers to testify, over the defendant's objection, that before they arrested the defendant, they witnessed him drive away in a stolen car. The court gave two limiting instructions, neither of which mentioned that the grand jury had failed to indict on the stolen car charge. Instead, the court told the jury not to infer whether "the *defendant did or did not steal the car*" (*id.* at 388).

We reversed the defendant's conviction in *Resek* because "[a]dmission of the testimony under these circumstances was . . . error" (*id.* at 389). Because the trial court failed to inform the jury that the grand jury did not indict the defendant on the stolen car charge, the police testimony "left the jury with an incomplete and prejudicial narrative," which outweighed the evidence's "legitimate" probative value: preventing speculation by the jury that "the police wrongfully targeted [the defendant] or otherwise abused their authority" (*id.*). The prejudice to the defendant "was not ameliorated by the court's limiting instruction," which we explained "made matters worse" by implying that the defendant may have, in fact, committed the uncharged crime (*id.*). In light of these circumstances—and given that the defendant "conceded his possession of the recovered drugs he was charged with intending to sell"—we concluded that it would have "sufficed [for the trial court] to instruct the jurors that the arrest was lawful and that they were not to speculate as to its reasons" (*id.* at 390), as had been suggested by Resek's counsel before jury selection (*see id.* at 388).

*Tosca* and *Resek* are on equal footing. We recognized in both cases that suppression of uncharged crime evidence may lead the jury to speculate that the police actions were wrongful (*see Resek*, 3 NY3d at 389; *Tosca*, 98 NY2d at 661), and in such situations, the evidence may be relevant to a material, nonpropensity issue: providing "background information" that explains the police encounter (*Tosca, supra*) "and thus help[s] the jury understand the case in context" (*Resek* at 389). The analysis follows under *Tosca* and *Resek* that, if the evidence's probative value in explaining the police encounter outweighs any undue prejudice to the defendant, the trial court may, in its discretion, admit the evidence with "proper limiting instructions" (*Resek, supra; see Tosca, supra*).

Determining whether the probity of such evidence exceeds the prejudice to the defendant "is a delicate business," and as in almost every case involving *Molineux* or *Molineux*-type evidence, there is the risk "that uncharged crime testimony may

improperly divert the jury from the case at hand or introduce more prejudice than evidentiary value" (*Resek* at 389). Yet this case-specific, discretionary exercise remains within the sound province of the trial court (*see id.* at 388-389; *Tosca, supra*), which is in the best position to evaluate the evidence (*see e.g. People v Scarola*, 71 NY2d 769, 777-778 [1988]). Thus, the trial court's decision to admit the evidence may not be disturbed simply because a contrary determination could have been made or would have been reasonable. Rather, it must constitute an abuse of discretion as a matter of law (*see Cass*, 18 NY3d at 560 n 3).

## III

On this record, we cannot say that the admission of the 911 evidence was an abuse of discretion. The trial court reasonably determined that, given the aggressive nature of the police confrontation with defendant and the attendant risk of improper speculation by the jury, the 911 evidence was necessary to provide background information explaining the police actions, and that its probative value outweighed the potential prejudice to defendant (*see Tosca*, 98 NY2d at 661). Defendant claims that the 911 evidence had no probative value because he admitted to possessing the gun and agreed not to challenge the propriety of the police stop. But the 911 evidence was probative of *all* of the police conduct in this case, not just the stop itself. The police behaved aggressively *after* the stop and *before* they discovered the gun by singling out defendant, grabbing him, and forcing him up against their patrol car. By specifying why the officers stopped defendant in the first instance, the 911 evidence allowed the jury to put this conduct in the proper context.

The evidence was also probative of the officers' credibility, which was a central issue for the jury to resolve on the resisting arrest charge (*see People v Cotton*, 143 AD2d 680, 681 [2d Dept 1988]; *People v Utley*, 60 AD2d 657, 658 [2d Dept 1977]; *see generally People v Negron*, 91 NY2d 788, 792 [1998]). The People had the burden of proving every element of the resisting arrest charge (*see generally People v Hanley*, 5 NY3d 108, 113 [2005]), and meeting that burden depended largely on the jury's evaluation of the officers' testimony and, particularly, the weight the jury accorded it in relation to contrary testimony proffered by defendant (*see Cotton*, 143 AD2d at 680-681, citing *People v Gaimari*, 176 NY 84, 94 [1903]; *see also Negron*, 91 NY2d at 792 [it is "our long-standing recognition that a jury is entitled

to assess the credibility of witnesses and determine, for itself, what portion of their testimony to accept and the weight such testimony should be given"]). Although the officers admitted to grabbing defendant, pushing him against the car, and tackling him when he tried to escape, defendant testified that the officers hit him several times in the head and face, that he never tried to escape, and that the officers' violent acts were essentially unprovoked. There was also contrary testimony about how the officers recovered the gun, which direction defendant was walking when he was stopped, and whether he was alone or with two black men as described in the radio run. The 911 evidence better enabled the jury to resolve these discrepancies and assess the credibility of the officers' testimony. Without a complete picture of the events preceding the encounter, the jury would have had little reason not to fault the officers for being overly aggressive and to discredit their testimony as untruthful.

Any potential for prejudice here was offset by the trial court's four strong limiting instructions, which emphasized that the 911 evidence "was not to be considered proof of the uncharged crime" (*Tosca*, 98 NY2d at 661). The prejudicial tipping point in *Resek* was the botched jury instruction, during which the trial court insinuated that the defendant may have been guilty of stealing the car (*see* 3 NY3d at 388). The court's instructions in this case, by contrast, were well-timed, thorough, and in no way compounded the potential prejudice to defendant.[4]

Jurors are presumed to have followed a trial judge's limiting instructions (*see e.g. People v Davis*, 58 NY2d 1102, 1104 [1983]), and that presumption is appropriate here. The trial court explicitly instructed the jury, on four occasions, that the 911 evidence was not being admitted "for the truth that a robbery in fact occurred or that defendant was in fact the one who did that robbery." Thus, the court did not "emphasize[ ] the robbery" (dissenting op at 604) so much as it emphasized the limited use of the 911 evidence. Defendant also took the stand to present his innocent possession defense, where he challenged the officers' version of the arrest and their credibility, without the risk

---

4. The dissent faults the trial court for its "numerous references" to the 911 evidence, contending that the four instructions only served to "continuously remind the jury of defendant's possible involvement in an armed robbery" (dissenting op at 604). But it is counterintuitive to assume defendant was prejudiced by the trial court's diligence in reminding the jury, at all critical junctures during trial, that it could not properly infer that defendant was guilty of armed robbery or consider the 911 evidence for any purpose other than "to explain the police actions" (*see Tosca*, 98 NY2d at 661).

of being cross-examined about the purported robbery. Although the jury ultimately rejected his defense, it rendered a "discerning and discrete verdict" (*Till*, 87 NY2d at 837), acquitting defendant of the weapon count charging possession with intent to use the gun unlawfully and the resisting arrest charge.

Apart from the confusing jury instruction, other circumstances that conspired to deprive Resek of a fair trial are not present in this case. The grand jury did not fail to indict defendant for robbery (because the People never presented that charge), and he therefore was never "cleared" of the underlying prior crime like the defendant in *Resek* (3 NY3d at 389). There is also no indication that *Resek* concerned an aggressive police encounter like the one at issue here, or that the credibility of the testifying officers was so entwined with the People's burden of proof on the charged crime of resisting arrest.

Finally, *Resek* does not require, as defendant and the dissent suggest, that a trial court suppress uncharged crime evidence every time a defendant proposes some "less prejudicial" alternative to admission (3 NY3d at 390). While trial courts cannot "automatically allow[ ] the prosecution to introduce evidence of uncharged crimes merely because the evidence is said to complete the narrative or furnish background information," they also need not exclude uncharged crime evidence simply because a defendant stipulates that "the arrest was lawful" and asks that the jury be instructed "not to speculate as to its reasons" (*id.*). A contrary rule would effectively nullify trial courts' discretion in these matters, and we would soon be called upon to parse which "means" are more or less prejudicial than others, when in fact trial courts are in a much better position to make these determinations.

Here, the trial court did not exceed its discretion by declining to instruct the jury that the stop was proper and to limit the officers' testimony to exclude the details of the radio run. The court fairly determined that these limitations, proposed by defendant, "would have placed a mystery before the jury" (*People v Barnes*, 57 AD3d 289, 290 [1st Dept 2008], *lv denied* 12 NY3d 781 [2009]), inviting it to speculate whether defendant was harassed by police and to "draw[ ] unfair inferences concerning the officers' credibility" (*Tosca*, 287 AD2d at 330 [trial court did not err in rejecting the "(d)efendant's proffered stipulation that the police were simply responding to an unspecified radio run"]). Although other "less prejudicial means" may have been available or reasonable in this case (*Resek*, 3 NY3d at 390), the

trial court did not abuse its discretion by failing to employ them, and we discern no basis upon which to disturb its decision.

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting). The majority's decision extends a limited exception for background and narrative evidence to the well established rule prohibiting admission of uncharged crimes. The majority upholds the admission of evidence of a 911 tape recording of unsubstantiated allegations of criminal activity, despite its lack of relevance to the charges against the defendant, and its prejudicial impact on the fairness of the trial. I dissent.

The rule prohibiting the admission of uncharged crimes is long standing (*see People v Arafet*, 13 NY3d 460, 464-465 [2009]; *People v Giles*, 11 NY3d 495, 499 [2008]; *People v Lewis*, 69 NY2d 321, 325 [1987]; *People v Alvino*, 71 NY2d 233, 241 [1987]; *People v Johnson*, 47 NY2d 785, 786 [1979]). It protects against the risk of a jury deciding against the defendant based not on the matters at hand, but on the juror's sensibilities about the character of the defendant and the defendant's propensity for criminal activity (*see Alvino*, 71 NY2d at 241 ["Evidence of similar uncharged crimes has probative value, but as a general rule it is excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past"]). To the extent we have recognized exceptions to the general rule prohibiting admission of uncharged crimes, we have done so in limited and narrow circumstances (*see People v Ventimiglia*, 52 NY2d 350, 359 [1981]; *People v Santarelli*, 49 NY2d 241, 247-248 [1980]; *People v Molineux*, 168 NY 264, 293 [1901]). It is the People's burden to establish the legal and factual basis for admission of evidence that is otherwise inadmissible (*see Arafet*, 13 NY3d at 470).

At issue in defendant's case is the "background and narrative" exception, under which otherwise inadmissible evidence of uncharged crimes may be admitted when the court determines that it is " 'needed as background material' . . . or to 'complete the narrative of the episode' " (*People v Till*, 87 NY2d 835, 837 [1995], quoting *People v Montanez*, 41 NY2d 53, 58 [1976], and *People v Gines*, 36 NY2d 932, 932-933 [1975], and citing *People v Morse*, 196 NY 306, 310 [1909], and *People v Governale*, 193 NY 581, 587 [1908]). The purpose is to assist the jury "to sort out ambiguous but material facts" (*People v Resek*, 3 NY3d 385, 390 [2004]). Absent such ambiguity, or where the ambiguity can be addressed "by far less prejudicial means" than the admission

of the uncharged crimes evidence, the exception is inapplicable (*id.* at 390).

In the limited cases where the exception applies, in order to be admissible the evidence of uncharged crimes must overcome two hurdles. First, it must be "relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged" (*Till*, 87 NY2d at 836; *see also People v Cass*, 18 NY3d 553, 560 [2012]). Second, its probative value must "outweigh[ ] the risk of undue prejudice to the defendant" (*Till*, 87 NY2d at 836, citing *People v Chase*, 85 NY2d 493, 502 [1995], *People v Carter*, 77 NY2d 95, 107 [1990], *People v Hudy*, 73 NY2d 40, 55 [1988], and *Alvino*, 71 NY2d at 241; *see also Cass*, 18 NY3d at 560; *People v Green*, 35 NY2d 437, 442 [1974] ["past events lacking both relevance and probative value are inadmissible"]; *People v Allweiss*, 48 NY2d 40, 47 [1979]).

The majority concludes that evidence contained in the 911 tape is relevant to the material, nonpropensity issue of providing background information that explained the police encounter, and helped the jury understand the case in context. I disagree.

The prosecution argued that admission of the 911 tape was necessary to explain the reason the police stopped the defendant, the justification for the police conduct during the search, and to explain the potential danger in which the officers found themselves during the police encounter with the defendant. However, there was no prosecution theory of defendant's guilt furthered or clarified by the 911 tape. Nor can it be said that on the facts of defendant's case the jury needed a deep, illustrative "narrative" of the police encounter to determine defendant's innocence or guilt of the charges.

As relevant here, all the People needed to prove the criminal weapons possession charges was that the police had stopped defendant, frisked him, and recovered a firearm from his person. In response, defendant would have advanced his claim of "transitory possession." The fact that the police stopped defendant based on a call about a robbery might have been relevant to assist the jury in understanding the lawfulness of the stop. However, once defense counsel stated that the defendant would not challenge the stop in any way, and offered for the judge's consideration an instruction that the stop was lawful, there was no ambiguity that could be clarified with the 911 tape evidence.

The majority concludes that evidence of the 911 call was needed to explain the resisting arrest charge, and that the

potential prejudice was outweighed because the tape was probative of *"all* of the police conduct" (majority op at 597). The majority is simply wrong in characterizing this evidence as necessary for the jury's understanding of the police conduct viewed in totality. Unlawful police conduct, presumably the alleged excessive use of force in this case, cannot be excused merely because the police had reasonable suspicion to stop (*see generally People v De Bour*, 40 NY2d 210, 223 [1976], citing CPL 140.50 [1]; *Terry v Ohio*, 392 US 1 [1968]), which is all that the 911 evidence presented to the jury. Moreover, the jury certainly did not need information to understand the police conduct when a gun was found on the defendant immediately after the stop.

As to the probative value of the 911 tape evidence with respect to the police officer's credibility on the resisting arrest charge, the majority ignores the fact that the exception for background and narrative is a narrow one, and is not intended as a backdoor to allow the prosecution to bolster the credibility of the People's witnesses. Otherwise, there would be carte blanche admission of this type of evidence whenever the credibility of the police is at issue. In such event the exception would swallow the rule.

The majority's conclusion also ignores the reality of the impact on the fairness of the proceedings of the playback of the 911 tape and the references to its contents throughout the trial. The playback of the tape was powerful evidence which planted in the jurors' minds the idea of defendant's criminal propensity. Although the tape was about an alleged robbery, the tape emphasized that a gun was involved, and that the possessor posed a danger beyond the actual robbery. According to the transcript of the call, the caller specifically stated that "A guy now pulled a gun in my face." In response to the operator's questions regarding whether there had been a theft of the caller's jewelry, the caller answers, "Yeah. I ain't worried about the chain, but the gun." Again, moments later in response to questions about the caller's present location, he answers, "I ain't concerned with the chain, I just want you to get this guy off the streets." Thus, the 911 evidence not only provided the jury an opportunity, if not an invitation, to treat defendant as the robber, but it also was suggestive of the danger posed by the robber to the purported victim, as well as the community at large. There can be no doubt that this evidence pointed the finger at the defendant for the alleged robbery. Such evidence was prejudicial to the defendant and risked the jury's diversion from the elements of the crimes actually charged.

The narrative presented to the jury was not a narrative that sought to complete the encounter with the police, or to better understand the facts—the only narrative permissible under our case law (*see Till*, 87 NY2d at 837). Rather, the narrative was a creative representation of the danger of a gun-toting robber on the streets, the robber being the defendant. If this were not enough to establish the prejudicial nature of this evidence, the evidence consisted of unsubstantiated allegations that never resulted in charges against the defendant. Thus, similar to *Resek*, where we noted that the defendant was cleared of the uncharged crime, the jury was not made fully aware of the fact that no criminal action was taken against defendant as a result of the 911 call (*see Resek*, 3 NY3d at 389-390). As in *Resek*, the narrative was misleading, providing an opportunity for the jury to speculate that the defendant committed the crime (*see id.*).

While uncharged crimes evidence is admitted to ensure that the jury will not " 'wander helpless' trying to sort out ambiguous but material facts" (*id.* at 390, quoting *Green*, 35 NY2d at 441), there was no real possibility on this record of the jury "wander[ing] helpless[ly], as in a maze, were the decisive occurrences not placed in some broader, expository context" (*Green*, 35 NY2d at 441-442, citing *People v Stanard*, 32 NY2d 143, 146 [1973]; *People v Atkins*, 7 AD2d 393, 397 [1959]). The concern for avoiding speculation on the part of the jury was not at issue. In my opinion, to the extent the jury speculated, such speculation was precipitated by the court's admission of the 911 call and its attempt to provide limiting instructions.

We have made clear that the exceptions to the prohibition on the admission of uncharged crimes are to be considered applicable in "exceptional circumstances, with limiting cautionary instructions" (*Till*, 87 NY2d at 837). Thus, the limiting nature of the evidence, and its role in the trial, must be further explained to the jury through proper instructions, always careful to cabin it for the jury's consideration, and with an eye to insuring that the instruction does not further prejudice the defendant (*see Resek*, 3 NY3d at 389 [limiting instruction is improper where it "made matters worse" by suggesting defendant's guilt]).

Here, the limiting instructions failed to cabin the jurors' consideration of the 911 evidence. Defendant conceded gun possession in order to advance a particular defense, and expressly agreed not to challenge the lawfulness of the stop. The court, however, proceeded to remind the jury on four, separate occasions that defendant was not under arrest for robbery. Those

instructions served to continuously remind the jury of defendant's possible involvement in an armed robbery. Perhaps even more detrimental to the defendant, the court's language suggested that there would be other references to the robbery. As the majority notes, the judge stated: "Indeed, if you hear any further testimony at this trial relative to those statements made by that caller, that evidence is not being admitted for the truth of what the caller is saying to the 911 dispatcher" (majority op at 592). This not only emphasized the robbery but alerted the jury to its continued significance to the trial. The fact that the court allowed the 911 tape to be played in open court, provided the jurors with a transcript of the call, permitted the police to testify to the call and the prosecutor to reference it several times, including during the summation, improperly drew attention to an uncharged crime. After numerous references by the judge, the centrality of the 911 evidence became all the more obvious to the jury. Thus, here there was a real possibility that the "jury may convict to punish the person portrayed by the evidence before them even though not convinced beyond a reasonable doubt of his guilt of the crime of which he is charged" (*Ventimiglia*, 52 NY2d at 359).*

Here, there was no need to admit the 911 evidence to assist the jury in gaining "a thorough appreciation of the interwoven events leading to defendant's culminating criminal conduct and of the competing theories of what happened and why" (*Till*, 87 NY2d at 837). As we stated in *Resek*, "there was no ambiguity that could not have been easily dealt with by far less prejudicial

---

* The majority discounts the effect of these instructions, and responds that it is counterintuitive to assume prejudice based on the judge's reminders to the jury not to infer defendant's guilt of the armed robbery and its instruction that the jurors consider the 911 evidence only to explain the police conduct (*see* majority op at 598 n 4). Taken to its logical conclusion, the majority's argument would mean that limiting instructions, regardless of content, repetition, and the evidence referenced by the instructions, are sufficient to overcome the prejudice inherent in the admission of evidence of uncharged crimes. That is certainly not the law. We have found that erroneous or misleading instructions cannot serve to adequately direct the jury as to the proper use of such evidence (*see e.g. Resek*, 3 NY3d at 389). Here, the several admonitions by the judge, emphasizing the playback and all other references to the 911 call, encouraged speculation about the defendant's role in the robbery.

To the extent the majority relies on the assumption that jurors are presumed to have followed a trial judge's limiting instructions (*see* majority op at 598-599), the majority fails to explain why that presumption does not apply to the instructions proposed by defense counsel. If the presumption applies, then we must assume the jurors would have followed defendant's proposed instructions, thus avoiding the misuse by the jury of prejudicial evidence.

means" (3 NY3d at 390). There was no need to "fill in gaps in 'interwoven events' " to contextualize the case for the jury (*id.* at 389). The evidence was not relevant and it was error to admit it (*see Cass*, 18 NY3d at 560 n 3). Further, the purported probative value as background information did not outweigh its prejudicial effect, and the judge's assessment otherwise was an abuse of discretion (*see id.*). I dissent.

SMITH, J. (dissenting). I agree with Judge Rivera that the 911 tape should not have been admitted, because its prejudicial impact far outweighed any value it might have in forestalling speculation about whether the police officers acted properly. I differ from Judge Rivera in that for me it is the hearsay rule, not the rule prohibiting proof of uncharged crimes, that makes the tape inadmissible. Defendant's possession and unlawful use of a firearm shortly before his arrest might well have been relevant to show his intent—if it could be proved by admissible evidence. But it could not be, and was not. As the trial court recognized, the tape of the 911 call was not admissible for the truth of the statements made by the caller. I find it impossible to believe that any jury, on the facts of this case, could limit its consideration of the tape to the nonhearsay purpose for which it was purportedly offered.

Judges GRAFFEO, READ and PIGOTT concur with Judge ABDUS-SALAAM; Judge RIVERA dissents in an opinion in which Chief Judge LIPPMAN concurs; Judge SMITH dissents in a separate opinion.

Order affirmed.