Appeal by the defendant from a judgment of the Supreme Court, Kings County (Demarest, J.), rendered March 17, 2005, convicting him of bribing a witness (three counts), upon a jury verdict, and imposing sentence.
Ordered that the judgment is affirmed.
The defendant stands convicted of three counts of bribing a witness for conduct aimed at convincing three teenage girls to recant their statements identifying his brother, Wesley Sykes, as the man who shot and killed Dennis Brown in a park in Brooklyn. The primary issue raised on appeal is whether the trial court’s evidentiary rulings, which permitted the prosecution to offer evidence that a fourth eyewitness to the Brown shooting, Bobby Gibson, was murdered the weekend before he was scheduled to testify against Sykes, deprived the defendant of a fair trial. We conclude that the defendant was not deprived of a fair trial and, accordingly, affirm.
The evidence presented at the defendant’s trial reveals that on the evening of September 4, 2001, Sykes rode his bicycle into a park in the Bedford-Stuyvesant section of Brooklyn, exchanged a few words with Brown, and fired several shots at him. On September 27, 2001, Brown died of the injuries he suffered in the shooting. A number of Brown’s friends were in the park and witnessed the shooting, including three teenage girls, Shaquanna Edmonds, Latisha Smith, and Naia Hardison, and one young man, Bobby Gibson. Sykes was arrested for Brown’s murder on October 23, 2001, and that night five eyewitnesses, including Gibson and two of the girls, identified him from a *848 lineup as the shooter. All three girls subsequently gave sworn audiotaped statements to police detectives and an assistant district attorney identifying Sykes as the shooter.
In May and June of 2002, as the date scheduled for his brother’s murder trial approached, the defendant made contact with each of the teenage girls who had witnessed the Brown shooting, and began to shower them with gifts and attention. Prior to meeting the defendant, each of the girls heard rumors that he was a dangerous man, and that he was looking for them. Describing these events, Shaquanna Edmonds testified that before she met the defendant for the first time in June 2002, a friend told her that the defendant wanted to talk to her, and that he was “mad about his brother.” The friend urged Edmonds to talk to the defendant because the defendant was a “very dangerous person,” and the friend did not want to see anything happen to Edmonds. However, once Edmonds actually met the defendant, he was “very nice,” took her out to restaurants to eat, and gave her $100 on two different occasions. On one occasion, Edmonds accompanied the defendant to a hotel, where he made “romantic overtures.”
Latisha Smith similarly testified that in the months after the defendant’s brother was arrested, two different friends told her that the defendant wanted to talk to her, and one of these friends warned her that the defendant was “capable of hurting people.” She met the defendant in late May 2002, and for a period of about a month, he called her frequently, took her out and bought food for her, and gave her money on a couple of occasions. During this period, Smith became so close to the defendant that they engaged in sexual relations.
The third girl, Naia Hardison, also testified that she was nervous when the defendant initially approached her and asked to talk to her, because she had heard a lot of rumors about him on the street. She had heard “that it’s either lie or die. He supposed to do this to us if we don’t testify.” Despite the rumors, the defendant was nice to her, showed her love like a big brother, took her out for meals, and gave her $500 or $600.
After establishing a relationship with the three girls, the defendant asked each one to speak to Michael Warren, the attorney defending his brother in the Brown murder case, and recant their identifications of Sykes as the shooter. On separate occasions in June 2002, the defendant brought each girl to Warren’s office to make recorded statements in which each recanted her prior identification of Sykes as the shooter, and stated instead that Corey McCollough, who had been with Sykes in the park that night, shot Brown over a gang-related dispute. The *849 defendant gave each of the girls $500 shortly after they made their statements to Warren.
A jury was selected in the Sykes trial on Thursday, June 27, 2002, and the presentation of evidence was scheduled to commence on Monday, July 1, 2002. On Thursday, June 27, Assistant District Attorney Steven Murphy met with Bobby Gibson, one of the eyewitnesses scheduled to testify against Sykes. Although Murphy had also arranged to meet with Edmonds and Smith, they did not appear, and Smith expressed reluctance to meet with him and come to court.
In the early morning hours of Saturday, June 29, 2002, Gibson was shot and killed. A man named Travis Ragsdale subsequently confessed to the murder, claiming that he was drunk when he got into an argument with Gibson at a party, resulting in the shooting. Although Ragsdale was charged with murder in the first degree on a witness-elimination theory, he was ultimately acquitted of that charge, and convicted of murder in the second degree.
Meanwhile, Edmonds was awakened from her sleep by the sound of gunshots on the morning of Saturday, June 29, 2002, and looked out her window to see Gibson’s body lying on the ground. She recalled thinking to herself, “What’s next? I guess I’m next.” Smith was also scared when she heard that Gibson had been killed, because at that time nobody knew who had killed him. Detective Warren Bond located all three girls that evening, and went to see them to ensure that they were all right. Although the girls “seemed very edgy,” they told Bond that they were okay. When asked why she did not reveal her contact with the defendant to the police at that point, Edmonds replied that she was worried about her “life,” explaining that she “didn’t know what was next,” and what the consequences of the shooting would be.
On the following evening, Sunday, June 30, 2002, Detective Bond received a phone call from Smith, who said that she had something to tell him. When Bond went to Smith’s location to meet with her, he found Edmonds and Hardison there as well. All three girls were very nervous and edgy. After much discussion, Smith told Detective Bond that she had been approached by an individual who told her that the girls “can either take money not to testify against Wesley Sykes or they can take a bullet.” Smith then disclosed that the girls had taken money from the defendant not to testify against Sykes. The three girls were transported to the police precinct, where they gave recorded statements to Assistant District Attorney Murphy. Murphy asked each of the girls whether they wished to be *850 relocated, and each replied that she did. The three girls and their families were immediately relocated to hotels by the District Attorney’s office. Smith, Edmonds, and Hardison all testified at the Sykes trial, and identified Sykes as the shooter. The defendant was present in court for his brother’s trial on the morning of Monday, July 1, 2002. However, as court officers gathered in the courtroom to arrest him that day, he left the courthouse and disappeared. The defendant was eventually located in Virginia using a false name, and was arrested on December 19, 2002. He was thereafter indicted on charges of witness tampering in the third degree (three counts) and bribing a witness (three counts).
Whether and to what extent to admit evidence that Gibson had been murdered just before he was to testify against Sykes was the subject of extensive discussion between the court, the prosecutor, and defense counsel during the course of the trial. The issue was first raised by the court prior to jury selection, because the trial judge was concerned that prospective jurors might have seen press coverage of Gibson’s murder, linking it to his role as a witness in the Sykes trial and implicating the defendant. Defense counsel argued that no reference at all should be made to the Gibson murder at trial because it was “wholly immaterial, separate and entirely unrelated” to the bribery and witness tampering charges against the defendant. The prosecutor argued that testimony regarding Gibson’s death was relevant to explain why the three teenage girls came forward to the District Attorney, and that absent evidence of Gibson’s death, the jury would be left to wonder why these witnesses “turned around” on the day of the Sykes trial. The prosecutor also emphasized that defense counsel had “explored” the files related to the relocation of the girls, “which are ugly” and which showed that the girls were “difficult” witnesses who had misbehaved in the hotels where they had been placed. He urged that it would be “obscene” to allow defense counsel to impeach the credibility of the girls by cross-examining them about the money given to them by the District Attorney’s office for housing and living expenses during their relocation “without knowing the dangers involved and why all these things took place.” After hearing arguments by counsel, the court indicated that it would formulate an instruction that would inform the jury that another person had been tried and found guilty of killing Gibson, and that there was no evidence that the defendant was responsible for Gibson’s death. Thereafter, in its preliminary instructions to prospective jurors, the court informed them that there had been extensive press coverage of some of the issues in the case, including the recent trial of a man named Travis *851 Ragsdale for the murder of Robert Gibson. The court advised the prospective jurors that the defendant was “not in any way accused of being involved in that murder.”
During a subsequent colloquy on this issue, the prosecutor indicated that he intended to elicit from the three girls that Gibson’s death was relevant to their states of mind because each had recanted her original statement identifying Sykes, and then adhered to her original statement. The court then ruled that testimony of the murder of another witness to the Brown shooting was “clearly appropriate and necessary given the nature of the case and the history of the witnesses]’ testimony.”
Defense counsel returned to this issue after jury selection, reiterating her position that the Gibson murder was unrelated to this case, and further arguing that because the homicide occurred after the events alleged in this case, it could not have gone to the state of mind of the complainants. She requested that if the court allowed evidence of the Gibson murder to be presented on the prosecution case, she be allowed to have Ragsdale’s videotaped confession played to the jury. The court adhered to its ruling that the prosecutor could make reference to the Gibson murder and its impact on the girls’ decision to change their minds about exonerating Sykes, but instructed him not to “belabor it” or insinuate that the defendant was connected to it.
In accordance with the court’s ruling, in his opening statement, the prosecutor referred to the Gibson murder and the impact it had on the girls. However, he cautioned the jury that it was important to remember that the defendant was on trial for bribing witnesses and witness tampering, that they would hear no evidence that the defendant was anywhere near the location of the Gibson shooting, and that someone else had been arrested for that shooting.
During the course of direct examination, the prosecutor elicited testimony from each of the three girls regarding the manner in which they learned of Gibson’s death, and the impact of his death upon them. In addition, the prosecutor was permitted to elicit testimony from Smith that at some point in June 2002, she heard the defendant state that he wanted to talk to two other witnesses to the Brown murder, Gibson and the victim’s brother, Corey Brown. The court allowed the prosecutor to elicit this testimony from Smith over defense counsel’s objection, concluding that defense counsel had opened the door by making an issue in her opening statement about the fact that although 8 to 10 people in the park witnessed the crime, the defendant had allegedly approached only the three teenage girls.
*852 After the People rested, defense counsel moved to admit Travis Ragsdale’s videotaped confession into evidence for the truth of his account of the Gibson murder. The court ruled that it would permit the videotaped confession into evidence, but warned defense counsel that if she put the tape in, she was giving the People the right to challenge the credibility of Ragsdale’s statements. The videotaped confession was thereafter played for the jury, and the court instructed the jury that since Ragsdale was admitting to criminal conduct, his statements were an exception to the hearsay rule, and were being admitted for their truth. Defense counsel thereafter stipulated to the admission of rebuttal evidence consisting of a portion of Gibson’s autopsy report. The autopsy report indicated that Gibson was killed by a bullet which entered his lower back, traveled through his abdomen, and perforated his spleen, liver, and heart.
On summation, defense counsel argued that the case against the defendant was a “witch hunt,” triggered by the assumption that Gibson was killed because he was a witness in the Sykes case. She submitted that this assumption “couldn’t be further from the truth” in light of Ragsdale’s confession. Defense counsel also challenged the girls’ credibility by stressing that they were receiving money from the District Attorney’s office each week during their relocation, and commenting that “[tjhese girls, they had assistance, and they treated the District Attorney’s office like their personal bank.” She added that the prosecution’s attempt to suggest the existence of a link between Gibson’s killing and his role as a prospective witness in the Sykes trial had been “[wjholly created” by the District Attorney’s office for the purpose of justifying the relocation of the girls. She also argued that the evidence at the Sykes trial pointed to Corey McCollough as the shooter, and asserted that the statements the girls made to Warren were indeed true, and they thereafter changed their stories only because the District Attorney threatened to arrest each one.
During his summation, the prosecutor also discussed the Gibson murder, commenting that, “We don’t have evidence that [the defendant is] behind the killing of Bobby Gibson. You don’t have evidence that even his brother Sykes did it. Might have. There’s a lot of reasons to speculate about it. But, if you don’t have evidence, you don’t arrest the person for the crime. So much for the witch hunt.” The prosecutor additionally focused on the credibility of Ragsdale’s confession, arguing that it left unanswered as many questions as it answered, including the identity of the person who allegedly passed Ragsdale the gun he used to shoot Gibson, and why both Gibson and another wit *853 ness to the Brown murder were present “at the same time that Travis Ragsdale was there with a gun.” He also noted that defense counsel was, in essence, asking the jury to believe that Ragsdale’s confession was the “end of [the] story” without asking further questions.
In its charge, the court instructed the jury that, as it had “repeatedly from the very beginning of this trial” told them, the defendant had “not been charged with causing the death of the witness Bobby Gibson.” The court also noted that the People had introduced evidence of Gibson’s death “for the purpose of explaining the state of mind of the three of the complainants . . . and to provide the background for their participation in the witness protection program of the District Attorney’s office.”
At the conclusion of the defendant’s trial, the jury returned a verdict acquitting him of three counts of witness tampering in the third degree and convicting him of three counts of bribing a witness. The defendant now appeals.
Initially, we reject the defendant’s contention that the verdict convicting him of three counts of bribing a witness was not supported by legally sufficient evidence. Pursuant to Penal Law § 215.00, a person is guilty of bribing a witness when he or she “confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that . . . the testimony of such witness will thereby be influenced.” Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant’s guilt beyond a reasonable doubt. The evidence presented at trial established that as his brother’s murder trial approached, the defendant sought out and befriended the three teenage girls who had identified Sykes as the man who shot Dennis Brown, taking them out to eat and giving them monetary gifts. He then asked each of them to make false statements exonerating his brother to his brother’s attorney, Warren, took them to Warren’s office and remained with them as they made their statements, and gave each of them $500 shortly after they made their statements to Warren. A rational trier of fact could have found, based on this evidence, that the defendant had “at least a unilateral perception or belief’ (People v Bac Tran, 80 NY2d 170, 178 [1992]) that the gifts and affection he conferred on each witness would influence her testimony in his brother’s upcoming trial. Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633 [2006]; People v Goldman, 175 AD2d 723, 724 [1991]).
*854 We further find that the defendant was not deprived of a fair trial by the admission of evidence that Gibson was murdered on the weekend before he was to testify as a witness in the Sykes trial, and of the defendant’s statement that he wanted to speak to Gibson shortly before the murder. The general rule in New York is that all relevant evidence is admissible at trial unless its admission is barred by some exclusionary rule (see People v Mateo, 2 NY3d 383, 425 [2004], cert denied 542 US 946 [2004]; People v Scarola, 71 NY2d 769, 777 [1988]; People v Pearce, 81 AD3d 856 [2011]). “Evidence is relevant if it has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence” (People v Scarola, 71 NY2d at 777; see People v Alvino, 71 NY2d 233, 241 [1987]). Relevant evidence may nevertheless be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury (see People v Caban, 14 NY3d 369, 374-375 [2010]; People v Scarola, 71 NY2d at 777).
Evidence of uncharged crimes is generally excluded under the Molineux rule (People v Molineux, 168 NY 264 [1901]) for policy reasons, because such evidence may induce the jury to base a finding of guilt on collateral matters, or to convict a defendant because of his or her past criminal history (see People v Alvino, 71 NY2d at 241). Nevertheless, evidence of prior uncharged crimes may be received if it is relevant to some issue other than the defendant’s criminal disposition (see People v Morris, 21 NY3d 588, 594 [2013]). The purposes for which uncharged crime evidence may properly be admitted include completing the narrative of the events charged in the indictment and providing necessary background information (see People v Morris, 21 NY3d at 594; People v Till, 87 NY2d 835, 837 [1995]). “Where there is a proper nonpropensity purpose, the decision whether to admit evidence of the defendant’s prior bad acts rests upon the trial court’s discretionary balancing of probative value and unfair prejudice” (People v Dorm, 12 NY3d 16, 19 [2009]; see People v Holden, 82 AD3d 1007, 1008 [2011]).
However, “[t]he Molineux rule was created to address a particular prejudice inherent to a particular type of proof: evidence of a defendant’s prior crimes and bad acts” (People v Cortez, 22 NY3d 1061, 1077 [2014, Abdus-Salaam, J., concurring]). That type of prejudice is not present in this case, because evidence that Gibson was murdered two days before he was scheduled to testify against Sykes did not constitute proof that the defendant *855 committed an uncharged crime or bad act. Thus, evidence of the Gibson murder is not Molineux evidence. In this regard, we note that although the prosecutor did indeed express his personal belief that the defendant was involved in the Gibson murder to the trial court during a colloquy, he did not express that belief to the jury. Rather, he stated to the jury, during both his opening statement and summation, that they would hear no evidence that the defendant was involved in the Gibson murder, and that he was not charged with that crime. While the prosecutor suggested the existence of a connection between Gibson’s role as a prospective witness in the Sykes trial and his murder by questioning the credibility of portions of the Ragsdale confession on summation, he did not argue to the jury that the defendant was involved in Gibson’s death. Further, the court minimized any possibility that the jury would mistakenly view the evidence of Gibson’s murder as evidence that the defendant was involved in that crime by instructing the jury that the defendant had not been charged in Gibson’s death, and that the evidence of Gibson’s murder had been introduced for the limited purpose of explaining the state of mind of the three girls, and providing background for their participation in the witness protection program (see People v Morris, 21 NY3d at 598). Jurors are presumed to have followed a trial judge’s limiting instructions (see People v Morris, 21 NY3d at 598; People v Davis, 58 NY2d 1102, 1104 [1983]).
Even if the evidence of Gibson’s death could arguably be viewed as suggesting that the defendant committed an uncharged crime, it was properly admitted to explain why the girls, having recanted their original statements identifying Sykes as Dennis Brown’s killer, admitted to the police that they had made false recantations, and adhered to their original statements. Indeed, two of the girls testified that Gibson’s murder, two days before the presentation of evidence in the Sykes trial was to begin, frightened them. The impact of Gibson’s murder on the state of mind of these witnesses was interwoven with the narrative of the charged crimes, and necessary to help the jury understand the case in context, because it explained the girls’ conduct in coming forward to disavow the recorded statements they had made to Warren which exonerated Sykes and implicated Corey McCollough in the Brown murder (see People v Tosca, 98 NY2d 660, 661 [2002]; People v Genyard, 84 AD3d 1398, 1400 [2011]; People v Devaughn, 84 AD3d 1394, 1395 [2011]; People v Jordan, 74 AD3d 986 [2010]). Although the defendant contends that evidence of the Gibson murder had no probative value because it occurred after each girl had already recanted her original statement to law enforcement officials and *856 accepted $500, we disagree. The absence of a credible explanation for why the girls readopted their original statements would have lent support to the defense argument that the statements the girls made to Warren were indeed true, and that Corey Mc-Collough, not Wesley Sykes, was Brown’s killer. The fact that it could be alternatively argued that the girls reneged on their agreement with the defendant and testified against Sykes at his trial because they were afraid of being imprisoned for perjury does not diminish the relevance of the proffered testimony in elucidating a key part of the narrative.
Moreover, in our view, it cannot be fairly said on this record that there was no proof establishing that Gibson’s murder played a role in the girls’ decision to retract their recantations. Both Edmonds and Smith acknowledged that the Gibson murder frightened them, and on the day after the shooting, Smith reached out to Detective Bond, who responded by going to meet with her. It was at that meeting with Bond that Smith disclosed that an individual had approached her and told her that the girls “can either take money not to testify against Wesley Sykes or they can take a bullet,” and thereafter disclosed their dealings with the defendant. It can reasonably be inferred from this evidence that the girls’ decision to come forward was motivated, at least in large part, by fear engendered by Gibson’s murder on the eve of his scheduled trial testimony in the Sykes case.
The evidence that Gibson was murdered shortly before he was to testify in the Sykes trial was also necessary to explain why the girls were placed in the District Attorney’s witness protection program. Although the defendant maintains that evidence of the girls’ participation in the witness protection program was immaterial because his trial counsel did not intend to make it an issue in the case, he did not object to the admission of this evidence at trial. Moreover, the record does not support the defendant’s assertion that his attorney did not intend to make the girls’ participation in the witness protection program an issue in this case. When the trial court first raised the issue of the Gibson murder, the prosecutor noted that defense counsel had examined the relocation files showing that the girls were difficult witnesses who had misbehaved in the hotels where they had been placed, and that “it would be obscene for the jury to be left with the impression that—without knowing the dangers involved and why all these things took place, just to hear about efforts we are making to give witnesses money.” During a lengthy discussion of this issue, defense counsel herself never represented to the trial court that she would not use the information contained in the relocation files *857 to impeach the girls’ credibility on cross-examination. Indeed, when the trial court stated that evidence of the Gibson murder was necessary to provide context in light of defense counsel’s intent to cross-examine the girls about incidents that occurred while they were participating in the witness protection program, defense counsel responded only by stating that she would ask for an immediate instruction that there was no connection between the Gibson murder and the defendant. Defense counsel thereafter extensively cross-examined each girl, in great detail, about the housing and other benefits received through participation in the witness protection program. Evidence that the District Attorney’s office had expended significant sums of money to provide the girls and their families with housing and living expenses during their participation in the witness protection program was pivotal to the defense theory that their statements to Warren exonerating the defendant’s brother were true, and that they disavowed those statements because of the monetary benefits they received from the District Attorney. Defense counsel also used information gleaned from the relocation files to cross-examine each girl about her conduct while participating in the program. This included questioning Edmonds as to whether she and her family had been kicked out of a hotel for “hanging out until all hours of the night in the lobby,” questioning Smith about angry messages she had left for the prosecutor because she felt that the District Attorney’s office was manipulating her and treating her unfairly, and eliciting testimony from Hardison that she had gotten into fights in some of the hotels where she had been placed, and had been kicked out of them.
To clarify, we do not suggest, as the dissent indicates, that defense counsel “opened the door” to the admission of evidence of the girls’ participation in the witness protection program by examining the relocation files, and failing to represent that she would not cross-examine the girls on this subject. The dispute in this case involved the admission of evidence of the Gibson murder, not of the girls’ participation in the witness protection program, and it is clear from the record that the admission of this evidence was a key part of the defense strategy.
More importantly, as our dissenting colleague recognizes, it has been held that there is no compelling reason why testimony “directly bearing on the motive to testify of a critical witness in a criminal trial, whose motive is important to an evaluation of her credibility . . . may not be considered as serving an appropriate probative purpose” for the admission of uncharged crime evidence (People v Beckles, 128 AD2d 435, 439 [1987]; see *858 People v Rodriguez, 143 AD2d 854, 855 [1988]). The admission of evidence bearing on the credibility of key witnesses serves the truth-finding process, in which it is the jury’s role to “assess the credibility of witnesses and determine, for itself, what portion of their testimony to accept and the weight such testimony should be given” (People v Negron, 91 NY2d 788, 792 [1998]; see People v Morris, 21 NY3d at 597-598). Evidence that Gibson’s death motivated the girls to come forward to the police and admit that they had been bribed by the defendant was particularly important to an assessment of their credibility in this case, since, as noted, a major theme of the defense was that the girls had retracted their recantations because of the money and benefits they received through their participation in the witness protection program. In the absence of evidence establishing a legitimate need for the girls’ participation in the program, the jury would not be able to place the defense argument in proper context. Accordingly, the trial court properly exercised its discretion in determining that the jury should be permitted to hear evidence of Gibson’s murder.
While our dissenting colleague also expresses concern that the admission of evidence of the Gibson murder on the People’s direct case caused the defendant to be subjected to a “trial within a trial” to determine whether he was complicit in the homicide, the defendant himself has not advanced this argument. In any event, we are satisfied that the defendant was not improperly subjected to a trial within a trial to determine his involvement in the Gibson murder. As noted, the jury was instructed that the defendant was not charged in the Gibson murder and instructed as to the limited purposes for which testimony of the murder was to be considered. Moreover, the prosecutor did not elicit any evidence of the defendant’s involvement in the Gibson murder, and informed the jury in his opening that they would hear no such evidence. Although the prosecutor offered a portion of Gibson’s autopsy report as rebuttal evidence to challenge the credibility of Ragsdale’s account of the shooting, defense counsel was clearly warned by the court that she would open the door to such rebuttal if she sought to admit Ragsdale’s videotaped confession into evidence. While the rebuttal evidence could be viewed as casting doubt on Ragsdale’s account of how and why the shooting occurred, it was not tantamount to an attempt to prove the defendant’s involvement in an uncharged crime.
It is also important to keep in mind that the subject of the Gibson murder, and the admissibility of evidence of its occurrence, were first raised by the trial court itself out of concern *859 that prospective jurors might have seen press coverage suggesting that Gibson was murdered because he was a witness in the Sykes trial, and that the defendant was involved in the murder. The court brought this issue to the forefront to afford the prosecutor and defense counsel a full opportunity to present arguments relating to the probative value of the challenged testimony, and its potential for prejudice, and ruled that evidence of the Gibson murder was admissible only after extensive discussions with the prosecutor and defense counsel. This is not a situation in which the trial court made its ruling without taking into consideration the potential that the defendant could be prejudiced by the admission of evidence of the Gibson murder.
Further, the trial court properly permitted the prosecutor to elicit testimony that Smith heard the defendant state that he wanted to talk to two other witnesses to the Brown murder, Gibson and the victim’s brother, Corey Brown. Defense counsel opened the door to this testimony by emphasizing during her opening statement that the girls were not the only witnesses to the Brown murder, and that in fact 8 to 10 people had witnessed the shooting, thus suggesting that there would be no reason for the defendant to single out just three of the witnesses against his brother (see People v Mateo, 2 NY3d at 425-426; People v Rojas, 97 NY2d 32, 38-40 [2001]; People v Martin, 100 AD3d 930 [2012]).
The defendant’s contention that he was deprived of a fair trial by certain comments the prosecutor made on summation relating to the Gibson murder is largely unpreserved for appellate review, since he failed to object to most of the challenged statements (see CPL 470.05 [2]; People v Morency, 104 AD3d 877, 878 [2013]; People v Hines, 102 AD3d 889, 890 [2013]). In any event, the challenged remarks were fair comment on the evidence, constituted a fair response to defense counsel’s summation, or otherwise do not warrant reversal (see People v Galloway, 54 NY2d 396, 401 [1981]; People v Ashwal, 39 NY2d 105, 109-110 [1976]; People v McGowan, 111 AD3d 850 [2013]; People v Barton, 110 AD3d 1089 [2013]; People v Morency, 104 AD3d at 878).
We also find no merit to the defendant’s contention that his adjudication as a persistent felony offender was unconstitutional pursuant to Apprendi v New Jersey (530 US 466 [2000]; see People v Battles, 16 NY3d 54, 59 [2010], cert denied 565 US —, 132 S Ct 123 [2011]; People v Quinones, 12 NY3d 116 [2009], cert denied 558 US 821 [2009]; People v Rivera, 5 NY3d 61 [2005], cert denied 546 US 984 [2005]; People v Rosen, 96 NY2d 329 [2001], cert denied 534 US 899 [2001]; People v Bazemore, *860 100 AD3d 915, 916 [2012]; People v Watts, 89 AD3d 965, 966 [2011]).
The defendant’s claim that the court improperly relied upon an unproven allegation of misconduct in imposing sentence is unpreserved for appellate review (see People v Walters, 90 AD3d 958, 959 [2011]; People v Mathieu, 83 AD3d 735, 737 [2011]; People v Baez, 52 AD3d 840 [2008]) and, in any event, without merit (see People v Walters, 90 AD3d at 959; People v Vaughan, 20 AD3d 940, 941-942 [2005]).
The court providently exercised its discretion in sentencing the defendant as a persistent felony offender (see Penal Law § 70.10 [2]). The court’s determination that the nature of the defendant’s criminal conduct, his history, and his character warranted extended incarceration and lifetime supervision is supported by the record (see People v Dixon, 107 AD3d 735, 736 [2013]; People v Maxwell, 22 AD3d 607 [2005]; People v Perry, 19 AD3d 619 [2005]).
The defendant’s remaining contentions, raised in his pro se supplemental brief, are unpreserved for appellate review and, in any event, without merit.
Eng, PJ., Rivera and Lott, JJ., concur.